**COMMONWEALTH of Pennsylvania, Appellant**

v.

**William R. LANDIS Jr., Appellee.**

**Commonwealth of Pennsylvania, Appellant**

v.

**William R. Landis Jr., Appellee.**

Superior Court of Pennsylvania.

Argued April 17, 2012.

Filed June 26, 2012.

Jonathan H. Kurtland, Assistant District Attorney, Reading, for Commonwealth, appellant.

Carson B. Morris, Philadelphia, for appellee.

BEFORE: STEVENS, P.J., BENDER, J., PANELLA, J., DONOHUE, J., ALLEN, J., MUNDY, J., OLSON, J., OTT, J., and WECHT, J.

OPINION BY STEVENS, P.J.

██ The Commonwealth appeals two pre-trial orders, which were entered on April 14, 2010, and August 12, 2010, in the Court of Common Pleas of Berks County, in two related criminal cases pertaining to Appellee William R. Landis, Jr., who was charged in connection with the murder of his wife, as well as the assault on police officers who attempted to take him into custody following a lengthy standoff.[1] On appeal, the Commonwealth contends (1) with regard to Appellee's case involving the assault on the police officers, the trial court erred in granting Appellee's request for a writ of *habeas corpus* on the charge of assault of law enforcement officer, 18 Pa.C.S.A. § 2702.1, and (2) with regard to Appellee's case involving the murder of his wife, the trial court erred in denying that portion of the Commonwealth's motion *in limine* in which the Commonwealth sought to introduce evidence Appellee shot at a police officer, who was attempting to take him into custody for his wife's murder, where such evidence is probative of Appellee's familiarity with firearms and his consciousness of guilt for the murder. After a careful review, for those portions of the orders relevant to this *en banc* appeal, we reverse the orders and remand the cases for further proceedings in accordance with this decision. We affirm the orders in all other respects.

The relevant facts and procedural history are as follows: Following the murder of Appellee's wife and his subsequent standoff with police, Appellee was arrested and charged with various offenses at cases docketed at CP–06–CR–0005405–2009 and CP–06–CR–0005405–2009.[2] The cases were

---

1. We note the Commonwealth has certified in its notices of appeal that the trial court's orders will terminate or substantially handicap the prosecution of Appellee. Thus, we may review the Commonwealth's appeals. *See Commonwealth v. Anderson*, 40 A.3d 1245 (Pa.Super.2012); Pa.R.A.P. 311(d).

2. The charges included: one count of murder of the first degree (18 Pa.C.S.A. § 3502(a)),

one count of murder of the third degree (18 Pa.C.S.A. § 2502(c)), one count of assault on a law enforcement officer (18 Pa.C.S.A. § 2702.1), nine counts of aggravated assault (18 Pa.C.S.A. § 2702), four counts of simple assault (18 Pa.C.S.A. § 2701); eleven counts of recklessly endangering another person (18 Pa.C.S.A. § 2705); one count of terroristic threats (18 Pa.C.S.A. § 2706), and two counts

initially joined and, on December 10, 2009, Appellee, who was represented by counsel, proceeded to a preliminary hearing at which Police Officers Eric Goss, Stephen Brock, and Matthew Beighley testified. Specifically, the officers' testimony revealed that, on October 28, 2009, at 9:21 p.m., they were dispatched to a secluded house at 537C Arrowhead Trail to investigate a possible shooting. N.T. 12/10/09 at 28–29, 75–76. Dispatch informed the officers that a man had called to report that a woman had been shot. N.T. 12/10/09 at 29, 76.

Within five to seven minutes of receiving the dispatch, several police vehicles arrived at the house. N.T. 12/10/09 at 31, 76. After conferring with each other, the officers deemed it necessary to approach the house to determine whether there were any victims inside needing assistance. N.T. 12/10/09 at 32–33. Thus, the officers approached the front door, which was fully opened, and announced their presence. N.T. 12/10/09 at 33–34. The officers received no response, but noticed that several lights were on inside of the house. N.T. 12/10/09 at 34. The officer in charge directed the other officers to tactically enter the residence to search for possible victims and/or suspects. N.T. 12/10/09 at 36. Officer Goss covered the front door and the downstairs, while Officer Travis Fritz, Detective Stephen Brock, and Officer Gary Thompson searched the upstairs. N.T. 12/10/09 at 36–37.

Within a minute of the officers going upstairs, Detective Brock discovered in a bedroom a "middle-aged female lying on her back with what appeared to . . . be at least one gunshot wound to the head area." N.T. 12/10/09 at 81. Detective Brock yelled, "We need an ambulance. We have a female victim with a gunshot wound to the head." N.T. 12/10/09 at 39. Officer

Goss maintained his position until Officer Thompson directed him to "clear the rest of the downstairs." N.T. 12/10/09 at 40. Thus, Officer Goss, along with Officer Thompson, Sergeant Roy Brennan, and Officer Fritz, checked the first floor dining room, kitchen, and living room, while Detective Brock initially stayed upstairs. N.T. 12/10/09 at 41, 83. Finding no victims or suspects on the first floor of the house, they proceeded to check the garage and noticed a door, which Officer Goss opened. N.T. 12/10/09 at 43. The door revealed steps leading to a lit basement. N.T. 12/10/09 at 43. From the basement, Officer Goss heard a noise, which sounded similar to a touch phone being dialed. N.T. 12/10/09 at 43. Officer Goss announced his presence and requested that the person in the basement "come out." N.T. 12/10/09 at 44. Officer Goss received no response, and thus, with Officer Thompson following closely behind him, Officer Goss cautiously walked down the basement stairs, with his gun drawn, scanning the area. N.T. 12/10/09 at 44. Officer Goss described the following:

[OFFICER GOSS]: As you go down the staircase, the stairs have a wall, a full wall, going on the left side, and the right side is cut open, showing a little bit of the basement area. As I was going down the stairs, there's also pictures on that wall, glass pictures of—I don't know what they are exactly. I observed an object in one of the pictures. It appeared to be coming from the right side. At that point, I began to turn to see if that object was next to me.

[PROSECUTOR]: All right. What did you see when you turned to your right?

[OFFICER GOSS]: I saw [Appellee].

\* \* \*

of possessing an instrument of crime (18 Pa. C.S.A. § 907).

[PROSECUTOR]: What, if anything, did you say to [Appellee]? What did [Appellee] say to you, sir?

[OFFICER GOSS]: The timeline for me going down the stairs, seeing the object was approximately three or four seconds. As I was going down, I was told, "Do not come down here."

[PROSECUTOR]: Who told you that?

[OFFICER GOSS]: It sounded like a male voice, [Appellee].

[PROSECUTOR]: From the basement?

[OFFICER GOSS]: Yes.

[PROSECUTOR]: All right. What, if anything, did you do or say in response to that order?

[OFFICER GOSS]: I briefly paused, and then [Appellee] yelled at me again.

[PROSECUTOR]: What did he yell?

[OFFICER GOSS]: It was, "Do not come down here," and then there was a pause, "or I'll kill you."

\* \* \*

[PROSECUTOR]: Ok. Where were you positioned when you first saw [Appellee] there?

[OFFICER GOSS]: I was right at the—I guess it would be the crest of where the wall on the right-hand side ends and the staircase is. So about the—I don't know—sixth step or so.

\* \* \*

[PROSECUTOR]: When you first observed [Appellee] [in this position] had you already heard him make the statements you testified to? Was that before or—

[OFFICER GOSS]: It was approximately right at the same time.

[PROSECUTOR]: All right. Can you describe what you saw when you saw [Appellee]? How did he appear? What, if anything, did he appear to be doing to you? Or doing. Excuse me.

[OFFICER GOSS]: I believe [Appellee] had an object in his hand. I'm not a hundred percent sure what the object was, but I believed it was a knife.

\* \* \*

[PROSECUTOR]: All right. What did you do when you observed the object in [Appellee's] hand?

[OFFICER GOSS]: I immediately started to re—go backwards on the staircase. And I advised [Officer] Gary Thompson that there was a male in the basement and to retreat.

[PROSECUTOR]: Officer Goss, why did you retreat? Why didn't you stay and learn more? Why did you retreat?

[OFFICER GOSS]: At that point, I was advised that we had one female shot. I did not know if that was a victim or a suspect. For my safety and the safety of the officers behind me, I wanted to go to a position of cover.

[PROSECUTOR]: All right. And did you, in fact, gain a position of cover?

[OFFICER GOSS]: I did.

[PROSECUTOR]: All right. Did [Appellee] . . . follow you up the stairs or remain in the basement?

[OFFICER GOSS]: He remained in the basement.

N.T. 12/10/09 at 45–47, 49, 50–52.

Officer Goss indicated that the entire sequence from when he partially went down the steps until he retreated lasted approximately thirty seconds. N.T. 12/10/09 at 73. Upon his retreat, Officer Goss advised Detective Brock, who had joined the other officers at the top of the basement stairs, that a suspect, who was later identified as Appellee, was in the basement. N.T. 12/10/09 at 66–67. With Officers Goss, Thompson, and Fritz standing behind him, Detective Brock stood at the top of the basement steps, taking cover

behind the basement door's frame. N.T. 12/10/09 at 85. Detective Brock announced his identity to Appellee and engaged in a conversation with him while the police awaited the arrival of the Berks County Emergency Tactical Team (Tactical Team). N.T. 12/10/09 at 66–67, 86. Specifically, Detective Brock, who was unable to see Appellee from his vantage point, yelled down the stairs, "Who's down there? Who are you? What's going on? Come up right now. Come up. We're going to come downstairs." N.T. 12/10/09 at 86–87. In response, Appellee yelled back, "Don't come down here. Don't send anybody down here or I'll shoot them." N.T. 12/10/09 at 87. Appellee asked Detective Brock, "How is my wife?" N.T. 12/10/09 at 67. Detective Brock responded that medics were treating her.[3] N.T. 12/10/09 at 67–68. During the conversation, Appellee momentarily came around the corner of the steps so that Detective Brock could see him and then quickly retreated further into the basement. N.T. 12/10/09 at 89. During his brief observation of Appellee, Detective Brock noticed that Appellee had a handgun pointed to his head and a large knife/sword in his other hand. N.T. 12/10/09 at 89–90, 117. Detective Brock asked Appellee what had happened, and Appellee repeatedly said, "Don't come down here. I don't want anybody to come down here. You know, I'll shoot anybody [that] comes down[.]" N.T. 12/10/09 at 91, 113. Appellee told Detective Brock, "I don't want to hurt anybody else. I just want to hurt myself, but if you send anybody down the steps— just don't send anybody down the steps or I'll shoot them, but I don't want to hurt anybody." N.T. 12/10/09 at 118.

Eventually, Appellee told Detective Brock that his name was "Bill." N.T. 12/10/09 at 91. He also told Detective Brock that "he and his wife had an argument and that she said she was going to kill him and he grabbed a gun and then accidentally shot her." N.T. 12/10/09 at 91. Appellee told Detective Brock he loved his wife and he could not live with himself for hurting her. N.T. 12/10/09 at 125. With regard to the conversation and Detective Brock's observations, Detective Brock testified as follows:

[PROSECUTOR]: During this conversation—this conversation that you have with him going back and forth, how— can you give us a time frame of how long you're speaking to him this initial time that you talked to him?

[DETECTIVE BROCK]: The initial time, the first time I was there, I would say probably a couple of hours.

[PROSECUTOR]: And as you're talking to him, you indicated you see him once. Does he come back towards the steps again?

[DETECTIVE BROCK]: A couple of times, yeah.

[PROSECUTOR]: And what does he do when he comes back to the steps?

[DETECTIVE BROCK]: Well, it was—there was a lot of actual encounters. He would retreat, and then he would come back. And then at one point, he was facing me and—

[PROSECUTOR]: Let me stop you. When you say he was facing you, where had he physically put himself?

[DETECTIVE BROCK]: At the bottom of the steps, looking right up the steps at me.

\* \* \*

[PROSECUTOR]: Okay you see him?

[DETECTIVE BROCK]: I'm standing right about here (pointing to sketch).

---

3. Appellee's wife died as a result of the gun-shot wound to her head.

[PROSECUTOR]: When he came to the bottom of the steps, were you still behind the initial post where you had talked about earlier?

[DETECTIVE BROCK]: Yeah. Throughout the entire incident, I wasn't always completely behind this. Most of the time, I was actually—most of my body—at least half of my body was exposed, so I could physically see down the stairs and hear what was going on.

\* \* \*

[PROSECUTOR]: What, if anything, did he do when he came to the bottom of the steps?

[DETECTIVE BROCK]: Well, he came to the steps, and I could see he didn't have anything in his hands initially, and I asked him to take everything out of his pockets. I was trying to get him to surrender, to give up. And he was pulling his pockets out, and he pulled a handgun out of his right pocket and was still looking at me and talking to me, but still holding the handgun in his hand.

[PROSECUTOR]: All right. And how was he holding that handgun in his hand?

[DETECTIVE BROCK]: Kind of probably like waist-high, like just out of his pocket, kind of. The barrel was pointed towards the steps, and just kind of still looking at me and speaking with me for a little bit, and then he retreated.

\* \* \*

We continued, you know, to have conversation back and forth. On at least two [occasions,] he came around the corner to the bottom of the stairs and was actually pointing the handgun up the stairs at me, kind of blading his body, where like—kind of like this way (indicating), right here where the post is (indicating), pointing the handgun up at me, the barrel—kind of aiming it, like, trying to line it up to where I was.

\* \* \*

[PROSECUTOR]: What if anything, did you say or do when [Appellee] had the gun pointed at you?

[DETECTIVE BROCK]: I was telling him to put the gun down, to stop pointing the gun at me.

[PROSECUTOR]: Did [Appellee] comply with your commands?

[DETECTIVE BROCK]: No. He—no. He wasn't really saying much at that point. It was once, and then it was—at least two different times that he did that.

[PROSECUTOR]: Did you have a weapon that night?

[DETECTIVE BROCK]: Yes.

[PROSECUTOR]: And where was your weapon? Let me kind of back up a second. When you first—is your weapon drawn?

[DETECTIVE BROCK]: Yes.

[PROSECUTOR]: Was your weapon drawn the entire evening?

[DETECTIVE BROCK]: Not the entire evening, but—

[PROSECUTOR]: When [Appellee] pointed the gun at you, where was your weapon?

[DETECTIVE BROCK]: Pointing down the stairs in his direction.

N.T. 12/10/09 at 91–98.

Detective Brock indicated that, during his initial leg of the standoff, Appellee started gathering family items, such as jewelry, and placed it on the stairs, indicating it should go to his mother. N.T. 12/10/09 at 98. Appellee alternated between speaking to people on the phone, pointing the gun at the police, and engaging in brief conversation with Detective Brock. N.T. 12/10/09 at 98–99. However,

despite the repeated commands to do so, Appellee refused to surrender, and after a few hours, Detective Fick from the Berks County negotiators division relieved Detective Brock. N.T. 12/10/09 at 99–100.

Detective Fick engaged in negotiations with Appellee, who remained inside of the basement, for a few hours, and then Detective Brock returned to engage Appellee in further negotiations. N.T. 12/10/09 at 100. At this time, Detective Brock noticed that Appellee, who had been drinking wine during the standoff, was slurring his words. N.T. 12/10/09 at 102. During his negotiations with Appellee, Detective Brock remained primarily positioned at the top of the basement stairs. N.T. 12/10/09 at 129.

Throughout the evening, members of the Tactical Team arrived, taking a position at the top of the basement stairs. N.T. 12/10/09 at 139. Detective Matthew Beighley, who was a member of the Tactical Team, stood with his rifle pointed down the basement steps. N.T. 12/10/09 at 141. The Tactical Team was instructed that, if Appellee presented himself at the bottom of the steps unarmed, the Tactical Team was to attempt to take him into custody using "less-lethal means." N.T. 12/10/09 at 142. In this regard, Detective Beighley testified on direct examination as follows:

[DETECTIVE BEIGHLEY]: At around two o'clock in the morning, th[e] opportunity presented itself, and negotiators were talking to [Appellee] and got him to stand at the bottom of the steps with no weapons visible. The decision was made to implement a less-lethal tactical intervention, to try to take the— take [Appellee] into custody.

[PROSECUTOR]: Now, you described it as a less-lethal tactical intervention. Specifically, what was the plan? How were you going to accomplish or complete this less-than-lethal means?

[DETECTIVE BEIGHLEY]: We had a 45—a 40–millimeter grenade launcher that shot sponge foam rounds and a Taser.

[PROSECUTOR]: Who was responsible for using the Taser?

[DETECTIVE BEIGHLEY]: I was.

[PROSECUTOR]: Who was responsible for using the sponge foam rounds?

[DETECTIVE BEIGHLEY]: Detective Keener, K-e-e-n-e-r.

[PROSECUTOR]: Do you know or were you aware of where Detective Keener was positioned when the attempt was done to take [Appellee] into custody?

[DETECTIVE BEIGHLEY]: Right immediately to my left. . . . That's where the ballistic shield was, and then we were up behind the shield, aiming down the steps.

[PROSECUTOR]: And was Detective Keener to your right then behind the shield or to your left?

[DETECTIVE BEIGHLEY]: To my left.

[PROSECUTOR]: All right. And you also see other individuals . . . besides yourself and Detective Keener?

[DETECTIVE BEIGHLEY]: Uh-huh.

[PROSECUTOR]: They are Sergeant Reber, Sergeant Peterson, Officer Gausch, Officer Downs, Sergeant Cassel, Officer Moreland, Officer Caraballo, Officer Fick. To your knowledge, were all these individuals there in the first floor of the residence when the attempt was made to take [Appellee] into custody?

[DETECTIVE BEIGHLEY]: Yes.

[PROSECUTOR]: At some point, was a sponge round and/or Taser used?

[DETECTIVE BEIGHLEY]: Yes. We tried to do it simultaneously.

[PROSECUTOR]: You and Officer Keener?

[DETECTIVE BEIGHLEY]: Yeah.

[PROSECUTOR]: Tell us what happened.

[DETECTIVE BEIGHLEY]: The sponge round went off. I fired at [Appellee] with the Taser. The plan was to incapacitate him using the less-lethal means and then take him into custody at the bottom of the stairs before he had a chance to recover.

[PROSECUTOR]: Where was [Appellee] when the Taser and sponge round were used?

[DETECTIVE BEIGHLEY]: At the bottom of the stairs. [PROSECUTOR]: How was he positioned at the bottom of the stairs?

[DETECTIVE BEIGHLEY]: Facing up to us, with his back to the wall.

\* \* \*

[PROSECUTOR]: Where were his hands?

[DETECTIVE BEIGHLEY]: Down at his sides.

[PROSECUTOR]: All right. What did you see happen after the Taser and sponge round were deployed? What did you see, if anything, happen to [Appellee]?

[DETECTIVE BEIGHLEY]: The sponge round struck him in the abdomen. At the same time, I fired the Taser. We began to rush down the stairs. I saw—I had to go down first with the Taser, because the way that the Taser works is that it has a cartridge attached to the front. When you activate the Taser, two probes are fired out with wires attached to each probe. In order for it to work, the probes have to make contact with the person you're shooting—you're using it on, and then the wires also have to be—have to stay together. If the wires become disconnected or break or get tangled or any-

thing else like that, it would stop the Taser from working properly. I had to go down first to clear out the wires, in order—to make sure that everybody else coming up behind me didn't get tangled up and break contact with it.

[PROSECUTOR]: All right. And you observed Mr.—you indicated you observed [Appellee] hit by the sponge round in the abdomen. Did your Taser—did you hit him?

[DETECTIVE BEIGHLEY]: I believed that I—when I initially saw it, I thought that I had hit him with both—I saw one of the probes hit him. We were rushing down the stairs, I saw him—he crumpled over from the impact to his abdomen with the sponge round. He fell back into the wall, and then he began moving forward as I was coming down the steps. I got down—I started coming down towards the bottom of the steps, I saw him pick up a gun and begin bringing it up towards—towards us, coming down the steps.

[PROSECUTOR]: Where did you see him pick up the gun from?

[DETECTIVE BEIGHLEY]: It was somewhere off-it was either on the ground or on a chair or something that was out of our view prior to getting past this header-header board.

\* \* \*

He could have pulled it from [his] back, too. I don't really remember where he retrieved it from, but it was a silver—looked like it would be a 380.

\* \* \*

[PROSECUTOR]: When you saw him retrieve the gun, Officer Beighley, did you continue going down the stairs? What did you do?

[DETECTIVE BEIGHLEY]: No. I yelled out that he had a gun, and I

turned around and started pushing the guys back up the steps.

[PROSECUTOR]: All right. And at this point when you saw and you yelled the gun, you indicated at some point you also saw it pointed at you. Had you yelled, "Gun," after you saw him point it at you or before you saw him point it at you?

[DETECTIVE BEIGHLEY]: As he was bringing it up.

[PROSECUTOR]: All right.

[DETECTIVE BEIGHLEY]: I saw him bringing it up and pointing it at me, and I yelled, "Gun," and pushed everybody back up the stairs.

[PROSECUTOR]: Simultaneously?

[DETECTIVE BEIGHLEY]: Yes. Like I said, this happened—this was probably seconds that all this occurred. From the time that we took the first shots with the less-lethal, to going down the steps, to him picking up the gun and firing at us and us going back up the steps was seconds.

[PROSECUTOR]: As you started going back up the steps after yelling, "Gun," what, if anything, did you observe or note [Appellee] doing?

[DETECTIVE BEIGHLEY]: He was bringing the gun up towards us and retreating back into the—towards the back of the room.

[PROSECUTOR]: Was he retreating back, running backwards, running with his back—so you could see his back? How was he retreating?

[DETECTIVE BEIGHLEY]: No. He was sideways. He had the gun in his right hand, and he was bringing it up as he was coming. He was kind of bent over with his left hand, because that's where he had gotten struck with the sponge round, and he was coming, he was pointing it at us, like that (indicat-ing). If I was coming down the steps here (indicating), he was pointing at us like that (indicating).

[PROSECUTOR]: All right. And what happened? What, if anything, did you see or hear as you went up the steps?

[DETECTIVE BEIGHLEY]: I heard a gunshot.

\*　　　\*　　　\*

[PROSECUTOR]: Where [were] you . . . when you heard the gunshot?

[DETECTIVE BEIGHLEY]: My head was just past that header, if you want to call it the header (indicating).

\*　　　\*　　　\*

[PROSECUTOR]: All right. And was any other team members exposed besides you?

[DETECTIVE BEIGHLEY]: No.

\*　　　\*　　　\*

[PROSECUTOR]: Did you hear just one shot or more than one shot?

[DETECTIVE BEIGHLEY]: I heard one gunshot.

[PROSECUTOR]: After you heard the one gunshot, what happened? Were you hit?

[DETECTIVE BEIGHLEY]: No, I was not.

[PROSECUTOR]: All right. What happened? What were you and your team members on the [Tactical Team] doing after you got back to the top of the stairs?

[DETECTIVE BEIGHLEY]: We policed each other to make sure that— well, they policed me to make sure I didn't get shot.

[PROSECUTOR]: What does that mean?

[DETECTIVE BEIGHLEY]: Adrenaline was—adrenaline was kind of going, and I didn't immediately feel any kind of

contact or anything, but they—we just kind of looked at each other, made sure everybody was okay.

And then we turned around, stacked back up, and they started negotiating—trying to negotiate with [Appellee] all over again.

N.T. 12/10/09 at 142–147, 150–153, 155–156.

On cross-examination, Detective Beighley clarified as follows regarding the shot, which Appellee fired:

[DEFENSE COUNSEL]: Now, [Appellee] fired one shot, is that right?

[DETECTIVE BEIGHLEY]: Yes.

[DEFENSE COUNSEL]: He stopped shooting after you were running up the stairs, correct?

[DETECTIVE BEIGHLEY]: He fired as we were running up the stairs.

[DEFENSE COUNSEL]: So you had already started running up the stairs, and he fires a shot, is that right?

[DETECTIVE BEIGHLEY]: Yes. We had started to turn around. He brought the gun up towards us, pointed it at us and then fired as we were going up the steps.

[DEFENSE COUNSEL]: Well, none of the police officers, fortunately, w[ere] hit with a gunshot, is that right?

[DETECTIVE BEIGHLEY]: That's correct.

[DEFENSE COUNSEL]: So when you say he pointed it at you, is that what you mean?

[DETECTIVE BEIGHLEY]: Yeah. He pointed it at—like, he was coming up (indicating). I saw the gun pointed at me. I expected to get shot. I thought I was.

[DEFENSE COUNSEL]: Okay. But as it turns out, after pointing the gun right at you, he moved the gun?

[DETECTIVE BEIGHLEY]: Yeah. By that time, my head was going up past that header. I heard the fire—I heard the gunshot. So I didn't see where he was aiming when the gunshot went off.

[DEFENSE COUNSEL]: But after pointing the gun directly at you, is that right, he did not pull the trigger, correct.

[DETECTIVE BEIGHLEY]: No.

[DEFENSE COUNSEL]: Okay. He moved the gun in the opposite direction of where the police were running, correct?

[DETECTIVE BEIGHLEY]: I don't know. I didn't see it. Obviously, from where he fired, he didn't shoot me. So he had moved it, or his aim was off. I don't know.

N.T. 12/10/09 at 159–160.

On redirect examination, Detective Beighley further clarified the following:

[PROSECUTOR]: When you saw the gun pointed at you, did you leave yourself as a stationary target for [Appellee]?

[DETECTIVE BEIGHLEY]: No, I did not.

[PROSECUTOR]: How much time passed from him pointing at you and you shouting, "Gun," did you hear a shot?

[DETECTIVE BEIGHLEY]: Seconds.

N.T. 12/10/09 at 160.

Eventually, the police took into custody Appellee, who had in his possession two handguns and a knife. N.T. 12/10/09 at 132. The police discovered that the shot, which Appellee fired when Detective Beighley and Officer Keener rushed down the stairs, had landed in a picture hanging on the wall at the bottom of the stairs. N.T. 12/10/09 at 157–58.

At the conclusion of all testimony, the magistrate bound over all charges for trial. On February 17, 2010, Appellee filed an omnibus pre-trial motion requesting, *inter alia*, a writ of *habeas corpus* on the charges of murder in the first degree as to his wife and assault of law enforcement officer as to Detective Beighley, as well as severance of the charges related to the murder of his wife from the charges related to the assault upon the officers who attempted to take him into custody. Following a hearing, by order filed on April 14, 2010, the trial court granted Appellee's request for severance of the cases and issued a writ of *habeas corpus* on the charge of assault of law enforcement officer. The Commonwealth filed a timely appeal of the issuance of the writ, and all Pa.R.A.P. 1925 requirements have been met.

Since severance was granted, the trial court retained jurisdiction over the murder case of Appellee's wife. On April 23, 2010, the Commonwealth, indicating it intended to try initially Appellee on the charges related to the murder of his wife, filed a motion *in limine* requesting permission to present the following evidence at the murder trial:

[1] [Appellee] stated to Officer Eric Goss of the Spring Township Police Department (STPD), 'Do not come down [to the basement] or I'll kill you.' The evidence will show that this statement was made in the context of when [Appellee] first encountered law enforcement and within approximately one hour after he had allegedly murdered [his wife]. This encounter initiated a continuous and uninterrupted standoff between [Appellee] and law enforcement, who were attempting to take him safely into custody. The evidence will show that the standoff lasted approximately eight hours.

[2] During the standoff, it is alleged [Appellee] pointed a loaded firearm at Detective Stephen Brock of the STPD in an effort to put him in fear of serious bodily injury and when Det. Brock was investigating and attempting to take [Appellee] into custody for the murder of [his wife].

[3] During the standoff, it is alleged [Appellee] repeatedly made statements to Det. Brock in the nature of: 'Don't come down here. Don't send anybody down here or I'll shoot them.'

[4] During the standoff, it is alleged [Appellee] discharged a firearm in an attempt to shoot and injure [Detective] Matthew Beighley, who, while acting in his capacity [as] a member of the Tactical Team, was attempting to take [Appellee] into custody for the murder of [his wife].

[5] In his attempt to shoot [Det.] Beighley, it is alleged [Appellee] recklessly placed nine other members of the [Tactical Team] in danger of death or serious bodily injury.

[6] At the time of this writing, it is believed and averred that the firearm that [Appellee] used to murder [his wife] is the same firearm that was used to shoot at [Det.] Beighley. [Appellee] was in control of the firearm throughout the standoff and when he was taken into custody at the end of the standoff.

Commonwealth's Motion *In Limine*, 5/13/10, at ¶ 8.

The trial court granted the Commonwealth's motion *in limine* with respect to the first three requests; however, the trial court denied the Commonwealth's fourth and fifth requests and modified the sixth request. Specifically, the trial court denied the Commonwealth's fourth request based on a lack of evidence that Appellee did, in fact, attempt to shoot Detective Beighley, and it denied the fifth request as

a "legal conclusion for the jury." The trial court modified the sixth request to "allow evidence that the firearm that [Appellee] used to murder [his wife] was the same firearm that was fired as [Detective] Beighley retreated if the evidence permitted it." Trial Court Opinion filed 10/20/10 at 2. The Commonwealth filed a timely appeal from the trial court's order, and all Pa.R.A.P. 1925 requirements have been met.

On September 17, 2010, upon the Commonwealth's request, this Court consolidated the two notices of appeal. The case was listed for oral argument, and in an opinion filed on May 20, 2011, a three-judge panel of this Court affirmed the trial court's orders. However, on June 3, 2011, the Commonwealth filed an application for reargument *en banc* and/or panel reconsideration, and on August 1, 2011, this Court granted the Commonwealth's application.

In this *en banc* appeal, the Commonwealth's first argument is that, with regard to Appellee's case involving the assault on the police officers during the standoff, the trial court erred in granting Appellee's request for a writ of *habeas corpus* on the charge of assault of law enforcement officer. Specifically, the Commonwealth asserts that, when viewed under the appropriate standard of review, it sufficiently established at the preliminary hearing a *prima facie* case for the charge of assault of law enforcement officer.

 "It is well-settled that the preliminary hearing serves a limited function. The purpose of a preliminary hearing is to avoid the incarceration or trial of a defendant unless there is sufficient evidence to establish a crime was committed and the probability the defendant could be connected with the crime." *Commonwealth v. Fox,* 422 Pa.Super. 224, 619 A.2d 327, 332

(1993) (quotations, quotation marks, and citations omitted). Where a criminal defendant seeks to challenge the sufficiency of the evidence presented at his preliminary hearing, he may do so by filing a writ of *habeas corpus. See Commonwealth v. McBride,* 528 Pa. 153, 595 A.2d 589 (1991).

> The decision to grant or deny a petition for writ of *[habeas corpus]* will be reversed on appeal only for a manifest abuse of discretion.... Our scope of review is limited to deciding whether a *prima facie* case was established.... [T]he Commonwealth must show sufficient probable cause that the defendant committed the offense, and the evidence should be such that if presented at trial, and accepted as true, the judge would be warranted in **allowing the case to go to the jury.** When deciding whether a *prima facie* case was established, we must view the evidence in the light most favorable to the Commonwealth, and we are to consider all reasonable inferences based on that evidence which could support a guilty verdict. The standard clearly does not require that the Commonwealth prove the accused's guilt beyond a reasonable doubt at this stage.

*Commonwealth v. Winger,* 957 A.2d 325, 328 (Pa.Super.2008) (quotations and citations omitted) (bold in original). Rather, the *prima facie* case merely requires evidence of the existence of each element of the crime charged. *See Commonwealth v. Patrick,* 933 A.2d 1043 (Pa.Super.2007) (en banc). The weight and credibility of the evidence is not a factor at this stage. *See id.*

The particular charge at issue in this case is assault of law enforcement officer, which is set forth, in pertinent part, at 18 Pa.C.S.A. § 2702.1,[4] as follows:

4. The 2008 amendment to the Crimes Code, which appears at 18 Pa.C.S.A. § 2702.1, be-

§ 2702.1. Assault of law enforcement officer

(a) **Assault of law enforcement officer in the first degree.**—A person commits a felony of the first degree who attempts to cause or intentionally or knowingly causes bodily injury [5] to a law enforcement officer,[6] while in the performance of duty and with knowledge that the victim is a law enforcement officer, by discharging a firearm.[7]

18 Pa.C.S.A. § 2702.1(a) (bold in original) (footnotes added).

There is no published opinion interpreting Section 2702.1; however, by its plain terms, we conclude Section 2702.1 requires that, in order for the Commonwealth to establish a *prima case* for the offense of assault of law enforcement officer in the instant case, the Commonwealth is required to set forth evidence that: (1) the defendant attempted to cause, or intentionally or knowingly caused, bodily injury, (2) the victim was a law enforcement officer acting in the performance of his duty, (3) the defendant had knowledge the victim was a law enforcement officer, and (4) in attempting to cause, or intentionally or knowingly causing such bodily injury, the defendant discharged a firearm. *See Mohamed v. Com., Dept. of Transportation, Bureau of Motor Vehicles,* 2012 WL 987799, at *6 (Pa. filed March 26, 2012)

("When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.") (quotation omitted).

In the case *sub judice,* Appellee concedes the Commonwealth set forth a *prima facie* case establishing that (1) Detective Beighley was a law enforcement officer acting in the performance of his duty, (2) Appellee had knowledge Detective Beighley was a law enforcement officer, and (3) Appellee actually discharged a firearm.[8] At issue is whether the Commonwealth set forth a *prima facie* case establishing Appellee "attempted to cause, or intentionally or knowingly caused bodily injury" to Detective Beighley by discharging a firearm.

We agree with Appellee that there is no evidence that Detective Beighley, or any other law enforcement officer, actually suffered bodily injury when Appellee discharged his firearm. However, this does not end our inquiry since, as indicated *supra,* the Commonwealth may establish a *prima facie* case under Section 2702.1 if the Commonwealth sets forth evidence Appellee attempted to cause such bodily injury.

---

came effective on December 16, 2008.

**5.** "Bodily injury" is defined in the Crimes Code as "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S.A. § 2301.

**6.** 18 Pa.C.S.A. § 2702.1(c) provides that "law enforcement officer" has the same meaning as "peace officer," which is defined in 18 Pa.C.S.A. § 501 as "[a]ny person who by virtue of his office or public employment is vested by law with a duty to maintain public order or to make arrests for offenses, whether that duty extends to all offenses or is limited to specific offenses[.]"

**7.** 18 Pa.C.S.A. § 2702.1(c) provides "firearm" is defined at 42 Pa.C.S.A. § 9712(e), as "[a]ny weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive or the expansion of gas therein."

**8.** Even if Appellee did not so concede, we conclude the Commonwealth clearly met its burden of proving a *prima facie* case with regard to these elements.

. Section 2702.1 does not further define what is required to prove criminal attempt, but Chapter 9 of the Crimes Code, which sets forth inchoate crimes, and is part of the Code's Preliminary Provisions, does define criminal attempt. Specifically, Section 901(a) indicates "[a] person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a). Thus, criminal attempt under Section 2702.1 requires a showing of some act, albeit not one actually causing bodily injury, accompanied by an intent to inflict bodily injury upon a law enforcement officer by discharging a firearm. *See* 18 Pa. C.S.A. §§ 901(a) and 2702.1(a).

In defining the necessary *mens rea* for criminal attempt, Section 302 of the Crimes Code addresses general requirements of culpability and defines "intentionally" as follows:

**§ 302. General requirements of culpability**

\* \* \*

**(b) Kinds of culpability defined.—**

(1) A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

(ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

18 Pa.C.S.A. § 302(b)(1)(i), (ii) (bold in original).

■■■ As our Court has previously stated with regard to proving intent for criminal attempt:

An intent is a subjective frame of mind, it is of necessity difficult of direct proof[.][W]e must look to all the evidence to establish intent, including, but not limited to, [the defendant's] conduct as it appeared to his eyes[.] Intent can be proven by direct or circumstantial evidence; it may be inferred from acts or conduct or from the attendant circumstances.

*Commonwealth v. Alford,* 880 A.2d 666, 671 (Pa.Super.2005) (quotation omitted). "The intent for attempt may be shown by circumstances which reasonably suggest that a defendant intended to cause [bodily] injury." *Commonwealth v. Emler,* 903 A.2d 1273, 1277 (Pa.Super.2006) (quotation omitted). Thus, in order to prove an attempt under Section 2702.1, the Commonwealth must demonstrate both a substantial step plus an intent to cause bodily injury to a law enforcement officer by discharging a firearm.

■■■ Here, we have no difficulty finding that the Commonwealth set forth a *prima facie* case that Appellee took a substantial step toward the commission of the crime with the necessary *mens rea.* That is, the Commonwealth set forth a *prima facie* case reasonably suggesting that, when Appellee discharged his firearm in the basement, he did so with the specific intent or "conscious object" to inflict bodily injury upon a law enforcement officer, namely, Detective Beighley. For example, the Commonwealth presented evidence that, after Appellee shot his wife in their secluded home during an argument, he dialed 911 to report the shooting and left the front door of the house fully open to permit entry. Apparently expecting the police would arrive, with at least two handguns and a knife in his possession, Appellee barricaded himself in the basement. Despite the obvious police presence upstairs, Appellee did not exit the basement

and continued to hide until the first police officer, Officer Goss, discovered him in the basement. Upon being discovered, Appellee threatened Officer Goss not to come down into the basement or he would kill him. Officer Goss quickly retreated and announced to the other police officers that he had discovered Appellee in the basement. Appellee then engaged in a lengthy standoff with police, who attempted to negotiate his surrender. During the negotiations, Appellee continued to threaten to kill anyone who came down the basement stairs and, at the times when he showed himself to the police negotiators, he pointed a gun at them.

Approximately four and one-half hours into the standoff, a Tactical Team attempted to take Appellee into custody using a Taser and sponge foam rounds. After these non-lethal methods were deployed, and with Detective Beighley and Officer Keener running quickly down the basement steps, Appellee, as he was attempting to retreat further into the basement after being hit by the non-lethal methods, pointed his handgun at the officers and fired. Detective Beighley, who was leading the charge, reacted quickly to the sight of the handgun by turning and pushing all of his fellow officers back up the stairs. It was later discovered that the shot had landed in a picture, which was hanging at the bottom of the stairs.

Based on the aforementioned, we conclude the trial court erred in determining the Commonwealth presented insufficient evidence to permit the charge of assault of law enforcement officer to be presented to a jury. See Winger, supra. In particular, contrary to the trial court, we conclude the Commonwealth set forth *prima facie* evidence that Appellee attempted to cause bodily injury to law enforcement officers, namely, Detective Beighley, who was attempting to take him into custody for the murder of his wife, by discharging his firearm.

Here, the evidence supports the reasonable inference Appellee actually intended his fired bullet to hit one of the officers, but the bullet failed to do so for a variety of reasons, including Appellee's poor aim. Additionally, the evidence supports the reasonable inference Appellee intended that the discharging of his gun in the direction of the officers would result in the charging officers falling down the stairs or trampling over each other. In any of these scenarios, the officers, and in particular Detective Beighley, could have suffered bodily injury, and a subsequent fact-finder could conclude this was Appellee's intent in discharging the firearm. *See Commonwealth v. Holley*, 945 A.2d 241, 247 (Pa.Super.2008) (holding that, in determining whether the Commonwealth proved intent to cause bodily injury, a fact-finder is free to conclude the accused intended the natural and probable consequences of his actions to result therefrom); *Commonwealth v. Rosado*, 454 Pa.Super. 17, 684 A.2d 605, 608 (1996) ("The fact that the accused misapprehended the circumstances, thereby making it impossible for him to commit the crime undertaken, is not a defense to an attempt crime."). Simply put, "[a] gun is a lethal weapon; pointing it towards a person, and then discharging it, speaks volumes as to one's intention." *Commonwealth v. Hall*, 574 Pa. 233, 830 A.2d 537 (2003). This is particularly true where a suspect discharges his firearm in an attempt to elude arrest. *See Hall, supra.* Thus, based on the evidence presented at the preliminary hearing, the Commonwealth demonstrated a *prima facie* case that Appellee discharged his gun in an attempt to inflict bodily injury upon known law enforcement officers in performance of their duties.

We note that, in granting Appellee's writ of *habeas corpus,* thus dismissing the charge of assault of law enforcement officer, the trial court determined the evidence tended to show that Appellee only intended to frighten, as opposed to inflict bodily injury upon, the officers when he discharged his gun. *See* Trial Court Opinion filed 8/2/10 at 5–6. In making this determination, the trial court placed great emphasis on the fact Appellee's bullet landed at the bottom of the stairwell, as opposed to at the top of the stairwell, closer to the retreating police officers. *See id.* However, we conclude that, in so determining, the trial court improperly weighed the evidence and failed to properly view the evidence in the light most favorable to the Commonwealth, as is required under the appropriate standard of review. *See Winger, supra.* We emphasize that it is inappropriate for the trial court to make credibility determinations in deciding whether the Commonwealth established a *prima facie* case, and the charge must be bound over for trial if evidence of the existence of each element of the offense is presented. *See Patrick, supra.* Simply put, it is for the jury to decide the weight to be given to the location of the bullet and the reasons Appellee did not succeed in actually shooting a police officer. Therefore, we reverse that portion of the trial court's April 14, 2010 order, which granted Appellee's motion for a writ of *habeas corpus* on the charge of assault of law enforcement officer.[9]

The Commonwealth's next argument in this *en banc* appeal is that, with regard to Appellee's case involving the murder of his wife, the trial court erred in denying that portion of the Commonwealth's motion *in limine* in which the Commonwealth sought to introduce evidence Appellee shot at a police officer, who was attempting to take him into custody for his wife's murder, where such evidence is probative of Appellee's familiarity with firearms and his consciousness of guilt for the murder.

In denying the Commonwealth's motion *in limine* as to this point, the trial court stated the following:

> It is up to the jury to interpret the evidence. This court would not allow the Commonwealth to inform the jury that [Appellee] shot at Officer Matthew Beighley in an attempt to injure or kill him because the only evidence that was presented to date is from the preliminary hearing. That testimony states that [Appellee] fired the gun after the officers had begun retreating and were out of harm's way. Furthermore, the shot was in the opposite direction of the retreat. **If evidence is produced at trial that [Appellee] attempted to shoot an officer, this court would allow it.** It denied the request as stated because it was premature and not part of the record at this time. If the Commonwealth had needed additional clarification of this court's ruling, it should have simply requested it.

Trial Court Opinion filed 10/21/10 at 2–3 (bold added).

Appellee concedes that our resolution of the Commonwealth's second *en banc* issue is entirely dependent upon our resolution of the first issue. That is, if the record sufficiently sets forth a *prima facie* case that Appellee "shot at" Detective Beighley when he was attempting to take Appellee into custody for the murder of his wife, such would be admissible in the murder trial. Having concluded the trial court abused its discretion in failing to find the Commonwealth established such a *prima facie* case, we are compelled to reverse the

---

9. We affirm the trial court's April 14, 2010 order in all other respects.

trial court's ruling in this regard as it relates to the August 12, 2010 order.[10]

For all of the foregoing reasons, with regard to the portions of the April 14, 2010 and August 12, 2010 orders relevant to this *en banc* appeal, we reverse and remand for further proceedings in accordance with this decision. We affirm the orders in all other respects.

April 14, 2010 Order reversed, in part, and affirmed, in part; August 2, 2010 Order reversed, in part, and affirmed, in part; Cases Remanded; Jurisdiction relinquished.

DONOHUE, J. files a Dissenting Opinion in which BENDER, J. joins.

DISSENTING OPINION BY DONOHUE, J.

I respectfully disagree. As noted by the learned Majority, we may reverse the trial court's decision to grant *habeas corpus* relief only upon a showing that the trial court has committed "a manifest abuse of discretion." *Commonwealth v. Hendricks,* 927 A.2d 289, 290 (Pa.Super.2007). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or is the result of partiality, prejudice, bias or ill-will, discretion is abused." *Commonwealth v. Fletcher,* 41 A.3d 892, 894 (Pa.Super.2012).

The court below found that the Commonwealth failed to present *prima facie* evidence that Appellee possessed the requisite *mens rea* for assault of a law enforcement officer. Trial Court Opinion, 7/27/10, at 5–6. As the Majority observed,

there are no appellate cases interpreting Section 2702.1 (relating to assault on a law enforcement officer). However, the *mens rea* requirement of Section 2702.1(a) is identical, in relevant part, to several subsections of the aggravated assault statute. *See* 18 Pa.C.S.A. § 2702(a)(1)-(5). As such, I find cases interpreting the aggravated assault statute to be instructive.

To determine whether a defendant intended to commit bodily injury under Section 2702, our Supreme Court has held that we must examine the totality of the circumstances surrounding the incident. *Commonwealth v. Alexander,* 477 Pa. 190, 194, 383 A.2d 887, 889 (1978); *see also Commonwealth v. Matthew,* 589 Pa. 487, 494, 909 A.2d 1254, 1258 (2006) (reaffirming the totality of the circumstances test pronounced in *Alexander* ). "For aggravated assault purposes, an 'attempt' is found where the accused, with the required specific intent, acts in a manner which constitutes a substantial step toward perpetrating a serious bodily injury upon another."[1] *Commonwealth v. Alford,* 880 A.2d 666, 670 (Pa.Super.2005). We look at both direct and circumstantial evidence, including the defendant's conduct at the time of the incident, in determining whether he or she possessed the requisite intent. *Id.* at 670–71.

In finding that the Commonwealth failed to satisfy its burden of proof, the trial court found the following:

> Throughout the long evening [Appellee] threatened to hurt himself or shoot anyone who tried to descend the stairs. He had several opportunities to attempt to shoot different police officials who stood

**10.** We affirm the trial court's August 12, 2010 order in all other respects.

**1.** Like the Majority, I agree with Appellee that there is no evidence that any law enforcement officer actually suffered bodily injury. I therefore confine my discussion to whether there is adequate evidence that Appellee attempted to cause bodily injury to a law enforcement officer.

at the top of the stairs. He did not try to shoot anyone. Instead, he engaged in conversations with them concerning various issues.

After [Appellee] was hit with sponges, he grabbed a gun and retreated away from the police. He did not advance toward the BCERT team. Thus, while the police officers were in his presence, [Appellee] did not threaten to shoot them or discharge his gun. When Officer [Beighley] saw [Appellee] pick up the gun, the officers immediately retreated up the stairs. Officer [Beighley] was the last officer up the stairs. He was past the open stairs when [Appellee] discharged his gun. [ . . . ] The discharge of the gun was in the opposite direction to where the police had retreated. [Appellee] did not attempt to shoot an officer.

Trial Court Opinion, 7/27/10, at 5–6. After thoroughly reviewing the totality of the circumstances surrounding the incident as set forth in the record, I find that our standard of review compels us to affirm the trial court's determination.

The record reflects that Officer Goss testified that Appellee told him not to come downstairs or he would kill him. N.T., 12/10/09, at 46. Officer Goss subsequently began descending the stairs to the basement, and observed Appellee downstairs holding what the officer believed to be a knife. Id. at 50–51; Commonwealth Exhibit 4. Officer Goss stood there looking at Appellee for approximately 30 seconds, during which Appellee made no threats to the officer and did not make a move to harm him. N.T., 12/10/09, at 61, 64.

Detective Brock testified that he was at the top of the stairs with Officer Goss and spoke with Appellee at length. Id. at 120. During their conversation, Appellee likewise threatened to shoot anyone who came downstairs. Id. at 87, 91. Appellee came to the bottom of the stairs multiple times, giving him ample opportunities to shoot the police officers present. Id. at 89–90, 95, 97. Although Appellee pointed his gun at Detective Brock, he took no action to harm anyone. Id. Indeed, at one point Detective Brock indicated that Appellee said: "I don't want to hurt anybody else. I just want to hurt myself, but if you send anybody down the steps—just don't send anybody down the steps or I'll shoot them, but I don't want to hurt anybody." Id. at 118.

Officer Beighley testified regarding the actual shot that occurred. He testified that as he came downstairs after he shot Appellee with the taser, he saw Appellee pick up a gun that was located near the bottom of the stairs. Id. at 146–47; Commonwealth's Exhibit 7. Officer Beighley immediately began retreating back upstairs with the other officers in front of him. N.T., 12/10/09, at 147. He testified that he saw Appellee bringing the gun up in the direction of the officers, but that Appellee was running away from the officers, towards the back of the room. Id. at 149. After Officer Beighley was almost all the way upstairs and was out of view from the basement, he heard a single gunshot. Id. at 152–53; Commonwealth Exhibit 4. He did not see where Appellee was aiming when he shot the gun. N.T., 12/10/09, at 160. The bullet struck a wall adjacent to where Officer Beighley had been when he was coming down the stairs, in the opposite direction of the officers' retreat. Id. at 157–58; Commonwealth Exhibit 8.

Even viewed in the light most favorable to the Commonwealth, there is no evidence that Appellee pointed the gun in the officers' direction when he fired the gun or in any way intended to cause them bodily injury by firing the gun. Although the record reflects that Appellee threatened to shoot the police, these were "conditional

threats," which we have previously held does not satisfy the *mens rea* requirement for specific intent. *See Alford*, 880 A.2d at 672. In *Alford*, this Court held that "[s]uch a threat ['either let me into the house *or* I may shoot you'], conditioned on the victim's performance of some act, is insufficient to prove aggravated assault." *Id.* The record in the instant case reflects that Appellee's threats to shoot the police officers were conditioned upon them coming downstairs—*either* you stay upstairs, *or* I may shoot you. N.T., 12/10/09, at 46, 87, 91.

The totality of the circumstances surrounding the incident does not support a finding that Appellee intended to cause bodily injury to the law enforcement officers. As the Commonwealth failed to present *prima facie* evidence of every element of the crime of assault of a law enforcement officer—*to wit*, the *mens rea* element—the record supports the trial court's grant of *habeas corpus* for the crime of assault of a law enforcement officer. Because the trial court did not override or misapply the law or exercise its judgment in a manifestly unreasonable manner, we have no basis to find the trial court abused its discretion. Therefore, I would affirm the trial court's order, and I dissent from the Majority's contrary conclusion.[2]

---

**2.** As stated by the Majority, the resolution of the Commonwealth's second issue raised on appeal—that the trial court abused its discretion by prohibiting it from introducing evidence that Appellant "shot at" a police officer while attempting to take him into custody—is dependent on our resolution of the first issue raised. Based on my conclusion that the trial court did not abuse its discretion by granting *habeas corpus* relief for the charge of assault of a law enforcement officer, I would further find that the trial court did not abuse its discretion by excluding said evidence.