## Commonwealth v. Pal

C.P. of Lackawanna County, No. 13 CR 2269

*Eugene M. Talerico, Jr., William J. Fisher* and *Brian J. Gallagher*, for Commonwealth.

*Paul J. Walker* and *Matthew Comerford*, for defendant.

NEALON, *J.*, November 27, 2013—Defendant, who has been charged with murder in the first degree and is facing a maximum sentence of life imprisonment, has filed a motion for bail pursuant to Article I, §14 of the Pennsylvania Constitution. Defendant contends that the magisterial district judge's preliminary hearing finding of a *prima facie* case of murder in the first degree does not render defendant ineligible for bail, and further argues that the trial judge must conduct a bail hearing and independently conclude that there is "clear and convincing evidence" of defendant's guilt of an offense punishable by life imprisonment in order to deny defendant's request for bail. The Commonwealth submits that once the magisterial district judge found a *prima facie* case of first-degree murder at the conclusion of the preliminary

hearing, the defendant no longer qualified for bail. In the alternative, the Commonwealth maintains that bail should be denied if the undersigned conducts a de novo review of the preliminary hearing evidence and finds that a *prima facie* case has been established.

Under Article I, §14 of the Constitution, a defendant who has been charged with first-degree murder is not entitled to bail "when the proof is evident or presumption great" that [s]he committed that offense for which the maximum sentence is life imprisonment. To satisfy that burden of proof, the Commonwealth must present evidence at a bail hearing which establishes a *prima facie* case of murder in the first degree, rather than clear and convincing evidence of that offense. Viewing the evidence in the light most favorable to the Commonwealth, and affording the prosecution the benefit of all inferences reasonably drawn from that evidence which would support a guilty verdict, our independent review of the Commonwealth's evidence confirms the existence of a *prima facie* case of defendant's accomplice and conspiratorial liability for first-degree murder. Therefore, defendant is not entitled to bail under Article I, §14 of the Constitution and 42 Pa.C.S.A. §5701, and his motion for bail will be denied.

## I. FACTUAL BACKGROUND

After a Dunmore resident, Frank Bonacci ("Bonacci"), failed to report to work or home on July 20, 2013, (Transcript of Proceedings, Preliminary Hearing ("T.P.") on 10/11/13 at pp. 36-37), the Dunmore Police Department initiated a "missing person" investigation. (T.P. 10/15/13 at pp. 217-219). On the evening of July 27, 2013, Bonacci's lifeless body was discovered inside his Jeep Liberty that had crashed at the bottom of a steep embankment near the Roaring Brook Step Falls, approximately .72 miles from

Ridge Row. (T.P. 10/11/13 at pp. 10-12, 17). Bonacci was found in the front passenger seat with an apparent fatal gunshot wound to the base of his skull, and a large rock was positioned on the vehicle's accelerator. (*Id.* at pp. 21, 30-31; T.P. 10/15/13 at p. 93).

The Crime Scene Unit of the Scranton Police Department was summoned to the Step Falls crime site which was situated adjacent to a railroad right-of-way near the University of Scranton tennis courts. (T.P. 10/15/13 at pp. 73, 77-79). Based upon the pooling, flow patterns and saturation of the decedent's blood, the position of Bonacci's body, the intact placement of his flip-flop sandals on his feet, and the absence of any blood transfer evidence, the police concluded that Bonacci had been shot in the back of his head while he was a front seat passenger in the Jeep Liberty as it was level. (*Id.* at pp. 81-92, 125-126, 134-136). The Crime Scene Unit detectives also determined that the shooter was seated in the passenger side, rear seat of the vehicle at the time that Bonacci was fatally shot. (*Id.* at pp. 92-93, 117-118, 140-141). Additionally, based upon the tire acceleration marks at the scene, the large rock present on the vehicle accelerator, and the location of Bonacci's body in the front passenger seat with his sandals still positioned on his feet, the investigators concluded that Bonacci was not operating his Jeep when it plunged down the seventy-two foot embankment. (*Id.* at pp. 92-94).

During the ensuing autopsy, a bullet projectile was retrieved from Bonacci's head and provided to the investigating police. (T.P. 10/11/13 at pp. 19-20, 24). Examination of that projectile by the Pennsylvania State Police Crime Laboratory determined that the projectile was a wad-cutter type bullet commonly used with a .38 caliber handgun. (T.P. 10/15/13 at pp. 94-96, 120). The police also discovered another unused .38 caliber wad-

cutter bullet near the crime scene. (*Id.* at pp. 102-103). The forensic pathologist who conducted the autopsy concluded that Bonacci died of a single gunshot wound to the head, and his manner of death was classified as homicide. (T.P. 10/11/13 at pp. 17-18).

The police investigation revealed that Bonacci had last been seen alive at approximately 6:50 AM on July 20, 2013, as he was walking with defendant, Neil Pal ("Pal"), and Jason Dominick ("Dominick") to Bonacci's Jeep which was parked in an alley adjacent to Pal's residence at 1419 Linden Street, Scranton. (T.P. 10/11/13 at pp. 54-55, 83-84). The investigators also learned of a history of hostility between Dominick and Bonacci involving Dominick's long time paramour, Ms. Keri Tucker. Dominick's friend, Christopher Genovese, stated that although Dominick was usually "laid back," he became a "crazy, obsessive-type" person with Ms. Tucker and would "freak out" in matters involving her. (T.P. 10/15/13 at pp. 13, 32-33). For example, when Dominick discovered that Mr. Genovese had forwarded a text message to Ms. Tucker during a period that she and Dominick were no longer dating, he traveled to Mr. Genovese's place of employment and initiated a physical altercation with Mr. Genovese. (T.P. 10/11/13 at pp. 199-200, 248; T.P. 10/15/13 at pp. 10-11, 25, 30-31).

Although Dominick and Ms. Tucker dated from more than four years, they ceased dating in February 2013 and Ms. Tucker began a romantic relationship with Bonacci in March 2013. (T.P. 10/11/13 at pp. 195, 197-198, 246, 249). Bonacci and Ms. Tucker dated from March 2013 through May 2013. (*Id.* at p. 202). On May 5, 2013, Dominick forwarded a text message to Pal which read, "[j]ust so you know, Neil [Pal], I'm cool with your boy, Frank [Bonacci], but if he ever gets cocky around me, I will just snuff him."

(T.P. 10/15/13 at p. 49).

After Bonacci and Ms. Tucker ended their amorous relationship, Bonacci saw Dominick at a Scranton bar in the early morning of June 8, 2013, and shook his hand. (T.P. 10/11/13 at pp. 202-203, 250). However, upon later seeing Dominick and Ms. Tucker together at that bar, Bonacci walked past them and "shoulder bumped" Tucker as he exited the bar. (*Id.* at pp. 203-204, 206, 241, 251). At 2:24 AM on that date, Bonacci forwarded a text message to Dominick which stated:

> Bro, you shook my hand tonight and said everything was good. WTF? Haha, you did real good. I fucked her last night. Have fun with your broken woman.

(T.P. 10/15/13 at pp. 51-52, 63-64).

Dominick became incensed upon reading Bonacci's text message and immediately called him on his cell phone and challenged him to meet at Step Falls in order to fight. (T.P. 10/11/13 at pp. 204, 207, 240, 242-243, 251-252). At 2:38 AM, Bonacci transmitted a text message to Pal that stated: "[y]o, your boy Jason [Dominick] is trying to fight me right now." (T.P. 10/15/13 at pp. 52, 57, 66). Dominick, Ms. Tucker and a third individual travelled to Step Falls where they met Pal and awaited Bonacci's arrival. (T.P. 10/11/13 at pp. 207-208). Pal spoke to Bonacci on his cell phone and encouraged him to fight Dominick at Step Falls, assuring him that it would be "a one-on-one fight if he did come down." (*Id.* at pp. 208-209). However, Bonacci declined the invitation and the fight at Step Falls never occurred. (*Id.* at pp. 209-210, 244, 253). A few days later, Dominick and Bonacci met at Pal's residence and reportedly resolved their differences for the time being. (*Id.* at pp. 210-245, 253).

On July 18, 2013, at 12:37 AM, Bonacci sent a text message to Ms. Tucker as she was laying in bed with Dominick. (*Id.* at pp. 212-213). The text message was transmitted in two separate sequences, and Dominick only viewed the first transmission. (*Id.* at p. 213). In his first text message, Bonacci stated:

> Sorry it's late, but I just wanted to say I'm sorry for everything I did when we were together. That wasn't the real me at the time. I know it sounds fucked up, but I felt different about you than I did with any other girl. I really do care about you and always will.

(*Id.* at p. 214; T.P. 10/15/13 at p. 53). Dominick never read the second text message from Bonacci which read:

> And I hope the best for you and that you [will] be happy in everything you do. Sorry it seems random, but it took me awhile to get over you to be okay.

(T.P. 10/11/13 at pp. 213-214; T.P. 10/15/13 at p. 53).

Later that same day, Dominick attended a party at Pal's residence. (T.P. 10/11/13 at pp.215-216). That party continued into the early morning of July 19, 2013, and Bonacci was also present at that party. (*Id.* at pp. 216-217). At 12:04 AM on July 19, 2013, Dominick forwarded a text message to Ms. Tucker while he was present at Pal's house, and stated: "[y]our boyfriend, Frankie [Bonacci], is here and [I] wouldn't be surprised if he is texting [you] because he knows I'm here and not with you." (*Id.* at p. 219; T.P. 10/15/13 at p. 54). After Dominick and Ms. Tucker exchanged text messages in which Dominick confirmed that he was at Pal's residence, Dominick transmitted another text message to Ms. Tucker at 2:25 AM which read "I hope [Bonacci] didn't leave to see you." (T.P. 10/11/13 at pp. 220-221; T.P. 10/15/13 at p.

54). Ms. Tucker then unsuccessfully attempted to speak to Dominick by cell phone, (T.P. 10/15/13 at pp. 67-68), and Dominick forwarded a responsive text message stating "I can't hear you" and "[p]lease sleep alone tonight." (T.P. 10/11/13 at pp. 221-222; T.P. 10/15/13 at p. 54).

More than four hours later, Ms. Tucker received another text message from Dominick at 4:56 AM on July 19, 2013, which read:

> Didn't do anything wrong. I'm in front of your boyfriend, Frank [Bonacci], and [Christopher Genovese] because Justin [Collaruso] got into a seriously bad car accident. We are going to CMC now. If you don't want me to go to your house after, fuck off and stop talking to me.

(T.P. 10/11/13 at p. 225). At 6:14 AM, Dominick texted Ms. Tucker "[c]oming now," but she did not respond since she was sleeping. (*Id.* at pp. 227-228). Dominick eventually arrived at Ms. Tucker's apartment shortly before 8:00 AM, and initiated an argument with her because her friends were sleeping on her floor. (*Id.* at pp. 228-229). A fight ensued during which Dominick called Ms. Tucker a derogatory, profane term and "spit on [her], so [she] hit him." (*Id.* at p. 229). After Ms. Tucker ordered Dominick to leave, he sent her a text message at 8:07 AM stating "[w]atch how you regret what you did to me this morning when you find out on the news what happened." (*Id.* at pp. 230-231). Finally, at 8:30 AM on July 19, 2013, Dominick forwarded an additional text message to Ms. Tucker that read:

> If you're not going to stop me now, you're going to find a hard reality if you think I'm kidding. Salute Keri Lee Tucker, I love so much...I love you. I really tried, babe. My towel is yours.

(*Id.* at p. 232).

The police investigation disclosed that Dominick and Pal "were best friends" since sophomore year at Scranton High School, (T.P. 10/11/13 at pp. 92-93), and even had "La Familia" tattoos signifying their close bond. (*Id.* at pp. 93-94, 116, 236; T.P. 10/15/13 at pp. 9, 24). The "La Familia" tattoos were intended to symbolize that "if something happened to one of them, they kind of took it as something happened to all of them like a family." (T.P. 10/11/13 at p. 93). The investigation also established that although Dominick did not own a gun, (T.P. 10/11/13 at p. 259; T.P. 10/15/13 at p. 29), Pal owned a .38 caliber black hand gun that he prominently displayed in his waistband when he was in public. (T.P. 10/11/13 at pp. 97-100, 118, 128; T.P. 10/15/13 at pp. 7, 20, 21). Cameron Kashmer attested that he purchased a .38 caliber gun from an unidentified African American male at Pal's garage, but later gave it to Pal in March 2013 to help defray a gambling debt that he owed to Pal. (T.P. 10/11/13 at pp. 171-175, 185-186, 190).

On the same day that Dominick forwarded the foregoing text messages to Ms. Tucker and engaged in a verbal and physical altercation with her, and one day after he had viewed Bonacci's text message to Ms. Tucker expressing continuing feelings for her, Pal hosted another party at his residence which began in the evening of July 19, 2013. Pal and Dominick were both present at that party, and Dominick was wearing a tee shirt, shorts and sneakers at that time. (T.P. 10/11/13 at pp. 48-49, 101-102; T.P. 10/15/13 at pp. 14-15, 17-18, 154-157). The party lasted for close to 12 hours and the attendees were participating in drinking games on the back deck of the residence. (T.P. 10/11/13 at pp. 45-48, 66; T.P. 10/15/13 at pp. 17-18, 154-155). Bonacci arrived at Pal's party at approximately 2:00

AM on July 20, 2013. (T.P. 10/11/13 at pp. 48, 74, 159; T.P. 10/15/13 at pp. 15, 154, 164). Shortly after 3:00 AM, two attendees, Sam Senuk and Alyssa Antonio, retired from the party and entered Pal's basement where they fell asleep. (T.P. 10/11/13 at pp. 159-161, 164, 166; T.P. 10/15/13 at pp. 155-156). At that time, Pal told Mr. Senuk that "[s]omebody was messing with Frankie [Bonacci]." (T.P. 10/11/13 at p. 161).

With the exception of Pal, Dominick, Bonacci and Brandon Emily, everyone in attendance at Pal's party had either departed or fallen asleep by 5:00 AM. (T.P. 10/11/13 at pp. 49-50, 67-68; T.P. 10/15/13 at pp. 15, 18-19). While those four individuals were standing on Pal's back deck at approximately 6:50 AM, Pal advised Mr. Emily that Pal was driving Dominick and Bonacci to their homes in Bonacci's Jeep. (T.P. 10/11/13 at pp. 51-53, 68, 81-82). Mr. Emily observed Pal, Dominick and Bonacci as they departed the back deck, walked down the adjacent alley and toward Bonacci's Jeep which was parked alongside Pal's garage. (*Id.* at pp. 53-56, 61-62, 83; T.P. 10/15/13 at pp. 225-226). Approximately 45 seconds later, Mr. Emily "heard Frankie's Jeep start up" and drive away. (T.P. 10/11/13 at pp. 54-55, 83-84).

University of Scranton security cameras located near its Ridge Row tennis courts depict Bonacci's Jeep crossing the Ridge Row railroad tracks into the University of Scranton's tennis courts parking lot, less than one mile from Pal's residence, at 6:51 AM. (T.P. 10/15/13 at pp. 195, 227-231). After Pal, Dominick and Bonacci had departed in Bonacci's vehicle, Mr. Emily sat on Pal's back deck until 7:11 AM when Mr. Emily's friend, Cory Riley, arrived to drive Mr. Emily home. (T.P. 10/11/13 at pp. 51-52, 57-58, 60-61). Between 7:18 AM and 7:33 AM, Pal initiated a series of calls to Maribeth Castaldi's cell

phone during which he inquired whether she was alone and could pick him up in her car. (T.P. 10/11/13 at pp. 102-105). Based upon their cell phone conversations, Ms. Castaldi retrieved Pal and Dominick as they were standing near the University of Scranton/Lackawanna College sign on the Central Scranton Expressway ramp from Route 81 South, and proceeded to drive them to Pal's residence on Linden Street. (*Id.* at pp. 105-106, 111-112, 123-124, 129-130). The exit ramp location where Ms. Castaldi collected Pal and Dominick is approximately 800 yards from where Bonacci's body and vehicle were found on July 27, 2013. (T.P. 10/15/13 at pp. 233, 256-257). Although Ms. Castaldi's boyfriend, Sean Barass, was present at Pal's home when she, Pal and Dominick arrived there on July 20, 2013, Ms. Castaldi did not disturb Mr. Barass since he was still asleep. (*Id.* at pp. 112-124-125).

At 8:30 AM, Dominick awakened Alyssa Antonio and Sam Senuk after Mr. Senuk's mother had arrived at Pal's residence to ensure that Mr. Senuk was not late for work. (T.P. 10/11/13 at pp. 167-168; T.P. 10/15/13 at pp. 156-157). When Dominick awakened Ms. Antonio, he was no longer wearing a shirt. (T.P. 10/15/13 at p. 157). Dominick, Pal, Sean Barass, Joe Barass and Ms. Antonio then drove to a local diner to eat breakfast. (*Id.* at pp. 158-159). Although Dominick had been wearing a tee shirt and sneakers during Pal's party, he wore flip-flop sandals and a pink button-down shirt of Pal's when they left for breakfast. (*Id.* at pp. 159-169). Police subsequently concluded that Pal and Dominick had burned their blood-stained clothes at Pal's residence. (T.P. 10/15/13 at pp. 248-249).

Later that same day, Keri Tucker noticed that Dominick had a burn mark on his hand, and when she asked him how it had occurred, he stated that he had burned it while making pizza in her oven. (T.P. 10/11/13 at pp. 236-238).

536

After Bonacci was reported missing, Pal and Dominick advised their friends that when Pal and Dominick arrived at Bonacci's Jeep on the morning of July 20, 2013, Bonacci declined to permit Pal and Dominick to travel with him and instead left Pal's party alone in his Jeep. (T.P. 10/11/13 at p. 234). Pal and Dominick provided that same version of events when they were first interviewed by the police. (T.P. 10/15/13 at pp. 177, 180, 189-190, 237-241). In those accounts, Pal and Dominick claimed that instead of walking back to the rear deck (i.e., where Brandon Emily was standing) after Bonacci had allegedly refused to travel with them, they returned to Pal's residence via a circuitous route in which they travelled through neighbors' yards and entered Pal's home by way of the front door. (*Id.* at pp. 190, 237-241).

When Pal was interviewed by the Dunmore Police on July 23, 2013, he referred to Bonacci in the past tense, thereby indicating to the investigators that "he knew that Frank Bonacci was dead already." (*Id.* at pp. 223-224). On July 27, 2013, Pal provided conflicting accounts to a friend, David Edsell, concerning the direction that Bonacci travelled when he purportedly left Pal's party alone on the morning of July 20, 2013. (T.P. 10/11/13 at pp. 146-148, 153). In addition, when Pal spoke to Maribeth Castaldi on the morning of August 1, 2013, he instructed her to tell the police that when he telephoned her shortly after 7:00 AM on July 20, 2013, he had called to request that she provide her boyfriend, Sean Barass, "a ride home, and [she] said that [she] couldn't because [she] had to work." (*Id.* at pp. 113, 126-127, 136-138).

Later on August 1, 2013, Pal was interviewed by Scranton Police detectives regarding Bonacci's murder. (T.P. 10/15/13 at pp. 233-235). After advising Pal of his *Miranda* rights and securing written waivers of his rights

to counsel and to remain silent, the detectives questioned Pal, at which time that he again claimed that Bonacci had declined Pal's offer to drive Bonacci and Dominick in Bonacci's Jeep, and had instead departed Pal's residence alone in his own vehicle. (T.P. 10/15/13 at pp. 235-240). During the initial portion of his interview, Pal "was very matter of fact" with his responses and displayed a rather relaxed demeanor. (*Id.* at p. 242).

However, Pal "basically froze" and his "entire demeanor changed" once the detectives confronted him with incriminating evidence, including cell phone records and the University of Scranton videotape surveillance, and advised him that Maribeth Castaldi had admitted transporting Pal and Dominick from the Central Scranton Expressway ramp to Pal's residence shortly before 8:00 AM on July 20, 2013. (*Id.* at pp. 242-243). Pal began "sweating profusely," "took deep breaths as if he was inhaling heavily," and "put his head in his hands and just shook it back and forth" repeatedly. (*Id.* at pp. 243-244). He also "engaged in lip licking repeatedly" and "was swallowing heavily" as he "had tears in his eyes." (*Id.* at p. 246). He then stated "you don't need me to tell you, you already know what happened, you can make your case." (*Id.*). Pal was arrested at that time, and a search of his garage on August 2, 2013, uncovered a spent .38 caliber casing and more than 240 bullet holes in the walls. (*Id.* at pp. 108-109, 246). The head stamp on the .38 caliber round that was discovered near the crime scene was identical to the head stamp on the .38 caliber casing retrieved from Pal's garage. (*Id.* at pp. 114, 119-120).

Pal was originally charged with criminal homicide as a principal, criminal conspiracy to commit homicide, and accomplice liability for criminal homicide, but on October 11, 2013, the Commonwealth withdrew the charge of

criminal homicide as a principal. (T.P. 10/11/13 at p. 6). At the conclusion of preliminary hearings that were conducted on October 11, 2013, and October 15, 2013, the criminal charges against Pal were bound over for trial. (T.P. 10/15/13 at pp. 274-275). On October 30, 2013, the Commonwealth filed a Criminal Information charging Pal with murder of the first degree as an accomplice, murder of the third degree as an accomplice, criminal conspiracy to commit murder of the first degree, and criminal conspiracy to commit murder of the third degree. (*See* Criminal Information, Counts I-IV).

On October 31, 2013, Pal filed a "Motion for Bail" which was made returnable for a hearing on November 25, 2013. Pal avers that he is eligible for bail under Article I, §14 of the Pennsylvania Constitution, and asserts that "the mere fact that the Commonwealth established a *prima facie* case of first degree murder at a preliminary hearing against a defendant does not render that defendant ineligible for bail." (Defendant's Motion for Bail at ¶¶3, 17). Pal submits that the trial court must conduct "its own evidentiary hearing" and "determine that 'the proof is evident or presumption great' that the defendant will be convicted of first degree murder" in order to deny Pal's request for bail. (*Id.* at ¶19). In his Motion for Bail, Pal argues that the Commonwealth bears the burden of proving his guilt by "clear and convincing evidence" at the bail hearing. (*Id.* at ¶25).

At the time of the bail hearing on November 25, 2013, the Commonwealth submitted the preliminary hearing transcripts as its sole proof in opposition to Pal's bail motion. In addition to presenting oral argument regarding the appropriate standard of review under Article I, §14 of the Constitution, Pal introduced the testimony of his father, Kushal Pal, and the affiant, Scranton Police

Detective Joseph Lafferty. Pal's Motion for Bail is now ripe for disposition.

## II. DISCUSSION

### (A) STANDARD OF REVIEW

The decision to grant or deny an application for bail is vested to the sound discretion of the trial court, *Com. v. McKown*, 2013 WL 5729802, at *13 (Pa. Super. 2013), and will be reversed only for an abuse of discretion "where the trial court 'misapplies the law, or its judgment is manifestly unreasonable, or the evidence of record shows that its decision is a result of partiality, prejudice, bias, or ill will.'" *Com. v. Bishop*, 829 A.2d 1170, 1172 (Pa. Super. 2003) (quoting *Com. v. Dunlavey*, 805 A.2d 562, 564 (Pa. Super. 2002)). "At a bail hearing, the Commonwealth bears the burden of proof." *Com. v. Heiser*, 330 Pa. Super. 70, 72, 478 A.2d 1355, 1356 (1984). Pennsylvania Rule of Criminal Procedure No. 520 governs an accused's right to bail prior to trial, and states that "[b]ail before verdict shall be set in all cases as permitted by law." Pa.R.Crim.P. 520(A). Therefore, it must first be determined whether the law permits a defendant, who is charged with first-degree murder and facing life imprisonment, to pre-trial release on bail.

### (B) CONSTITUTIONAL AND STATUTORY RESTRICTIONS

Pal's ability to secure bail is circumscribed by Article I, §14 of the Pennsylvania Constitution and Section 5701 of the Judicial Code, 42 Pa.C.S.A. §5701. Prior to 1998, Article I, §14 provided:

All prisoners shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident or presumption great; and the privilege of the writ of

habeas corpus shall not be suspended, unless when in case of rebellion or invasion the public safety may require it.

*Grimaud v. Com.*, 581 Pa. 398, 404, 865 A.2d 835, 839 (2005). Before the 1998 amendment to Article I, Section 14 of the constitution, 42 Pa.C.S.A. §5701 similarly stated:

All prisoners shall be bailable by sufficient sureties, unless for capital offense when the proof is evident or presumption great. Excessive bail shall not be required.

*Heiser*, 330 Pa. Super. at 72, 478 A.2d at 1356; *U.S. v. Leonetti*, 1988 WL 61738, at * 8 n. 3 (E.D. Pa. 1988). A "capital offense" under the these constitutional and statutory provisions means a crime such as first-degree murder for which the death penalty could be imposed. *See Com. v. Soltis*, 455 Pa. Super. 218, 227, 687 A.2d 1139, 1143 (1996), *app. denied*, 548 Pa. 647, 695 A.2d 786 (1997).

In *Com. ex rel Alberti v. Boyle*, 412 Pa. 398, 195 A.2d 97 (1963), the Supreme Court of Pennsylvania first addressed whether a defendant charged with a capital offense could be released on bail under Article I, §14 of the Pennsylvania Constitution. Construing the phrase "when the proof is evident or presumption great," the *Alberti* court held:

In other words, a capital offense is a crime for which the death penalty may, but need not, be inflicted. [citation omitted]. We are likewise convinced that the words in Section 14 "when the proof is evident or presumption great" mean that if the Commonwealth's evidence which is presented at the bail hearing, together with all reasonable inferences therefrom, is sufficient in law to sustain a verdict of murder in the first degree, bail should be refused. It follows that in the absence of such

evidence, the prisoner is entitled to bail.

*Id.* at 400-401, 195 A.2d at 98. *Accord Com. v. Manley,* 60 Pa. D. & C. 194, 195 (Lacka. Co. 1947) (interpreting Article I, §14 and holding "that if on the evidence submitted at the preliminary examination the court would not be justified in sustaining a verdict of murder in the first degree found by a jury upon such evidence, then defendant ought to be admitted to bail."). Nine years after *Alberti,* the Supreme Court again stated that "[t]he Constitution makes it clear that unless the 'proof is evident or presumption great' that a capital offense has been committed, the defendant prior to trial is entitled to bail." *Com. v. Caye,* 447 Pa. 213, 215, 290 A.2d 244, 245 (1972) (holding that where defendant was convicted of the non-capital offense of second-degree murder, he had an absolute right to bail).

After Pennsylvania's earlier death penalty scheme was invalidated in *Scoleri v. Pennsylvania,* 408 U.S. 934 (1972), and *Com. v. Bradley,* 449 Pa. 19, 295 A.2d 842 (1972), the Pennsylvania Supreme Court had occasion to revisit the phrase "capital offense" in article I, §14 in the context of a bail request by a defendant who was charged with first-degree murder. Relying upon *Alberti* and *Caye,* the Court in *Com. v. Truesdale,* 449 Pa. 325, 296 A.2d 829 (1972) determined "that 'capital offense' refers to the punishment or penalty which may be imposed upon the person found guilty of a crime, rather than a definition of a particular crime." *Id.* at 331, 296 A.2d at 832. Since there were no longer any "criminal offense in the Commonwealth for which the death penalty may be imposed" in 1972, *Truesdale* concluded that "there are no 'capital offenses'; hence, by mandate of our constitution, all offenses are bailable prior to trial." *Id.* at 331-332, 296 A.2d at 832. In support of its conclusion that the defendant who was charged with first-degree murder was entitled to

pre-trial bail, the Supreme Court reasoned:

> Prior to the invalidation of the death penalty, there was a strong flight urge because of the possibility of an accused forfeiting his life, and the framers of our constitution must have felt that if a person were accused of a crime and had to risk the possibility of receiving the death penalty or forfeiting bail, he would obviously choose the latter. However, they did not feel the urge to flee was as great where the maximum penalty was life imprisonment, as indicated by the failure to draft the constitution to read, bail may be denied in cases of "capital offenses or life imprisonment."

*Id.* at 337-337, 296 A.2d at 835.

Once Pennsylvania's death penalty statute was revised and withstood constitutional challenges in *Com. v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970 (1983), *Com. v. Peterkin*, 511 Pa. 299, 513 A.2d 373 (1986), *cert. denied*, 479 U.S. 1070 (1987), and *Com. v. Lambert*, 529 Pa. 320, 603 A.2d 568 (1992), the general assembly passed joint resolutions proposing an amendment to Article I, §14 of the Pennsylvania Constitution to change the first clause to read:

> All prisoners shall be bailable by sufficient sureties, unless for capital offenses *or for offenses for which the maximum sentence is life imprisonment or unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community* when the proof is evident or presumption great;....

*Grimaud*, 581 Pa. at 405, 865 A.2d at 839 (quoting Joint Resolution No. 1, 1998, P.L. 1327, H.B. No. 1520). Pursuant to Section 201.1 of the Pennsylvania Election

Code, the Attorney General of Pennsylvania prepared a "plain english statement" identifying "the purpose, limitations and effects of the ballot question" to be submitted to the electorate to amend Article I, §14 of the Constitution. *See* 25 P.S. §2621.1. In that "plain english statement," the attorney general explained:

The purpose of the ballot question is to amend the Pennsylvania Constitution to add two additional categories of criminal cases in which a person accused of a crime must be denied bail. Presently, the constitution allows any person accused of a crime to be released on bail unless the proof is evident or presumption great that the person committed a capital offense. A capital offense is an offense punishable by death. The Pennsylvania Supreme Court has ruled that a person accused of a crime that is not a capital offense may be denied bail only if no amount or condition of bail will assure the accused's presence at trial.

The ballot question would amend the constitution to disallow bail also in cases in which the accused is charged with an offense punishable by life imprisonment or in which no condition or combination of conditions other than imprisonment of the accused will reasonably assure the safety of any person and the community. The ballot question would extend to these two new categories of cases in which bail must be denied the same limitation that the constitution currently applies to capital cases. It would require that the proof be evident or presumption great that the accused committed the crime or that imprisonment of the accused is necessary to assure the safety of any person and the community.

The proposed amendment would have two effects. First, *it would require a court to deny bail when*

> *the proof is evident or presumption great that the accused committed a crime punishable by death or life imprisonment.* Second, it would require a court deciding whether or not to allow bail in a case in which the accused is charged with a crime not punishable by death or life imprisonment to consider not only the risk that the accused will fail to appear for trial, but also the danger that release of the accused would pose to any person and the community.

*Grimaud*, 581 Pa. at 410-411, 865 A.2d at 842-843 (emphasis added).

A majority of the electorate approved the amendment to Article I, §14 during the 1998 general election, *Id.* at 403, 865 A.2d at 838, and that provision now reads, in pertinent part:

> All prisoners shall be bailable by sufficient sureties, unless for capital offenses or for offenses for which the maximum sentence is life imprisonment or unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the proof is evident or presumption great;....

Pa. Const. art. I, §14. The effect of the 1998 amendment was to create two additional "exceptions to the right to bail" for (1) any offenses "for which the maximum sentence is life imprisonment," and (2) cases where no conditions "other than imprisonment will reasonably assure the safety of any person and the community." *Com. v. Jones*, 899 A.2d 353, 355 (Pa. Super. 2006). In an apparent effort to comport with that amendment, Section 5701 of the Judicial Code was amended in 2009, and now states:

All prisoners shall be bailable by sufficient sureties, unless:

(1) for capital offenses or for offenses for which the maximum sentence is life imprisonment; or

(2) no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the proof is evident or presumption great.

42 Pa.C.S.A. §5701. Unlike Article I, §14 of the Constitution, Section 5701 as amended includes the phrase "when the proof is evident or presumption great" only in subsection (2) relating to situations where no condition[s] "other than imprisonment will reasonably assure the safety of any person and the community." *Cf. In re Paulmier*, 594 Pa. 433, 448, 937 A.2d 364, 373 (2007) (holding that the use of the word "or" is disjunctive and "means one or the other of two or more alternatives.").

Prior to 1998, the Supreme Court consistently construed Article I, §14 as making a defendant who was charged with a capital offense eligible for bail unless the proof was evident or presumption great that [s]he committed that capital offense. *See Com. v. Martorano*, 535 Pa. 178, 185, 634 A.2d 1063, 1066 (1993) (stating that "a criminal defendant is not entitled to bail in a capital case when the proof is evident or the presumption great."); *Caye*, 447 Pa. at 215, 290 A.2d at 245 ("The Constitution makes it clear that unless the 'proof is evident or presumption great' that a capital offense has been committed, the defendant prior to trial is entitled to bail."); *Alberti*, 412 Pa. at 400-401, 195 A.2d at 98 (holding that in the absence of evidence "sufficient in law to sustain a verdict of murder in the first degree..., the prisoner is entitled to bail."). Even following

the 1998 amendment to Article I, §14, the Supreme Court acknowledged that the amended constitutional provision obligates "a court to deny bail when the proof is evident or presumption great that the accused committed a crime punishable by...life imprisonment." *Grimaud*, 581 Pa. at 411, 865 A.2d at 843. As worded, Section 5701 of the Judicial Code arguably appears to limit the "proof is evident or presumption great" requirement to instances where "no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community." *See* 42 Pa.C.S.A. §5701(2). Since the "proof is evident or presumption great" language does not appear in subsection (1) addressing capital offenses and life imprisonment offenses, *see* 42 Pa.C.S.A. §5701(1), an interpretive argument could conceivably be made that it is inapplicable to bail eligibility "for capital offenses or for offenses for which the maximum sentence is life imprisonment." However, where the Supreme Court has interpreted a constitutional provision, as it has done in *Grimaud, Martorano, Caye* and *Alberti*, it is presumed that when the legislature subsequently enacts a statute dealing with the same subject matter, the legislature intended the same construction to be provided to the language of the subsequent enactment. *See Com. v. Dickson*, 591 Pa. 364, 384, 918 A.2d 95, 107 (2007); *L.A.L. v. V.D.* 72 A.3d 690, 692 (Pa. Super. 2013). Since "[c]ourts are obligated to avoid constitutional difficulties and construes statutes in a constitutional manner if possible," *Com. v. Mohamud*, 15 A.3d 80, 85 (Pa. Super. 2010), the 2009 amendment to Section 5701 will be interpreted in conformity with Article I, §14 of the Constitution, as interpreted by our Supreme Court, so as to apply the "proof is evident or presumption great" requirement to bail requests by defendants charged with a crime that is punishable by life imprisonment.

Based upon the 1998 amendment to Article I, §14 and the foregoing pronouncements of the Pennsylvania Supreme Court, a defendant who is charged with an offense for which the maximum sentence is life imprisonment may be eligible for bail unless "the proof is evident or presumption great" that [s]he committed that offense. Murder in the first degree is an offense that is punishable by a sentence of life imprisonment. *See* Pa.C.S.A. §1102(a). The question of whether "the proof is evident or presumption great" that Pal committed that offense must be determined based upon "the Commonwealth's evidence which is presented at the bail hearing." *Alberti*, 412 Pa. at 400, 195 A.2d at 98. Hence, a trial judge considering such a bail request is not bound by the magisterial district judge's preliminary hearing determination, and must instead conduct an independent review of the Commonwealth's evidence.

## (C) COMMONWEALTH'S BURDEN OF PROOF

Neither Article I, §14 of the Constitution, nor 42 Pa.C.S.A. §5701 identifies the evidentiary burden governing the determination of "when the proof is evident or presumption great." Other states which have addressed that standard of proof have generally adopted one of three approaches: (1) a variation of a probable cause test; (2) a clear and convincing evidence standard; or (3) a requirement of evidence beyond a reasonable doubt.[1]

---

1. In Pennsylvania, "[p]robable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Com. v. Weaver*, 76 A.3d 562, 565 (Pa. Super. 2013). The clear and convincing evidence standard is more demanding than the preponderance of the evidence standard which "is defined as the greater weight of the evidence, i.e., to tip a scale slightly," *Raker v. Raker*, 847 A.2d 720, 724 (Pa. Super. 2004), and requires evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction,

*See State v. Furgal*, 161 N.H. 206, 216, 13 A.3d 272, 280 (2010); *Simpson v. Owens*, 207 Ariz. 261, 271, 85 P.3d 478, 488 (2004). Citing *Alberti* as authority, the Supreme Court of the Virgin Islands has identified Pennsylvania as a jurisdiction which employs a "clear and convincing evidence" standard in deciding whether "proof is evident or the presumption is great." *See Browne v. People of Virgin Islands*, 2008 WL 4132233, at * 11 n. 24 (V.I. 2008).

There is a paucity of appellate case law in this Commonwealth addressing the standard of review to be applied in deciding "when the proof is evident or presumption great" that the defendant committed murder in the first degree. As noted above, the Supreme Court in *Alberti* stated "that the words in Section 14 'when the proof is evident or presumption great' mean that if the Commonwealth's evidence which is presented at the bail hearing, together with all reasonable inferences therefrom, is sufficient in law to sustain a verdict of murder in the first degree, bail should be refused." *Alberti*, 412 Pa. at 400-401, 195 A.2d at 98. Eight years later, the Supreme Court considered the bail eligibility of a minor who had been charged with first-degree murder. In *Com. v. Farris*, 443 Pa. 251, 271 A.2d 906 (1971), a delinquency petition was presented to a Family Court Division judge who conducted a hearing and received evidence "that Farris fatally stabbed another youth in the back without provocation during a street gang fight." *Id.* at 252, 278 A.2d at 907. After the Family Court judge held the matter for further proceedings and the juvenile was subsequently

without hesitation, of the truth of the precise facts in issue." *In re S.T.S., Jr.*, 76 A.3d 24, 38 (Pa. Super. 2013). Under the "beyond a reasonable doubt" standard governing criminal prosecutions, a reasonable doubt "is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his or her own affairs." *Com. v. Simpson*, 66 A.3d 253, 274 (Pa. 2013).

indicted by a grand jury for murder, the defendant filed a petition for pre-trial bail which was denied by a trial judge in the criminal section of the common pleas court. In affirming the denial of bail, the Supreme Court held:

> Since evidence offered at the preliminary hearing in the family court division established a *prima facie* case of murder in the first degree, the court below did not err in refusing to release Farris on bail pending trial, and its order to this effect will be affirmed.

*Id.* at 253, 278 A.2d at 907.

Thirteen years after *Farris*, the Superior Court of Pennsylvania also applied a *prima facie* standard in determining a defendant's eligibility for bail under Article I, §14 and 42 Pa.C.S.A. §5701. In *Heiser, supra*, the Superior Court preliminary noted that "[a]t a bail hearing, the Commonwealth bears the burden of proof." *Heiser*, 330 Pa. Super. at 72, 478 A.2d at 1356. Citing *Farris* and *Alberti* as controlling authority, the *Heiser* court expressly held that the Commonwealth "can satisfy its burden to prove that a defendant is not entitled to bail by establishing a *prima facie* case of murder in the first degree." *Id.* at 72-73, 478 A.2d at 1356.

No appellate court in Pennsylvania has considered the Commonwealth's burden of proof under Article I, §14 and 42 Pa.C.S.A. §5701 since the 1984 decision in *Heiser*. During that almost thirty-year period, several common pleas courts have reached conflicting conclusions regarding the appropriate standard of proof. In *Com. v. Scarfo*, 43 Pa. D. & C.3d 339 (Phila. Co. 1987), the Philadelphia County court applied the *prima facie* standard in denying the petition for bail that was filed by a capital case defendant. *Id.* at 341-342. Other trial courts have held, albeit without reference to *Alberti* and its progeny, that defendants

charged with first-degree murder are automatically ineligible for bail. *See, e.g., Com. v. Levanduski*, 2003 WL 25600033, at *9 (Monroe Co. 2003) ("Defendant has been charged with criminal homicide, a felony of the first degree, an offense for which the maximum sentence is life imprisonment. Thus, Article I, §14 of the Pennsylvania Constitution does not provide for bail."); *Com. v. Quinn*, 2002 WL 34400888, at * 8 (Del. Co. 2002) ("Defendant was charged with murder under 18 Pa.C.S.A. §2502(a), (b) and (c) and faced a potential life sentence. Under the 1998 amendments to Article I, Section 14 of the Pennsylvania Constitution, defendant was not eligible for bail.").

However, in *Com. v. Hamborsky*, 75 Pa. D. & C.4th 505 (Fayette Co. 2005), the court concluded that an automatic denial of bail under Article I, §14, based solely on the potential penalty, was "irrational, unreasonable, and discriminatory" and violative of the Eighth Amendment to the United States Constitution. *Id.* at 513-515. The Fayette County court rejected the *prima facie* standard as too low of a level of proof, *Id.* at 515-516 & n. 1, and reasoned that the trial judge must instead conduct a bail hearing and decide whether the evidence presented demonstrates the "likelihood of a conviction, and how that bears on the likelihood of flight." *Id.* at 517. Based upon the evidence that was submitted by the prosecution in that case, the *Hamborsky* court found that "the Commonwealth has not shown that the 'proof is evident or presumption great' that Hamborsky did not act in self-defense," and, therefore, declared that "the defendant is bailable under Article I, Section 14 of the Pennsylvania Constitution." *Id.* at 520.

More recently, the trial court in *Com. v. O'Shea-Woomer*, 8 Pa. D. & C.5th 178 (Lanc. Co. 2009) analyzed "when the proof is evident or presumption great" in connection with a request for bail by a defendant who was

charged with first-degree murder. The Lancaster County court construed *Alberti* as making "a distinction between the Commonwealth's burden of proof at a preliminary hearing and at a bail hearing." *Id.* at 219. In finding that the Commonwealth was obligated to establish more than a *prima facie* case, the court observed "that the language 'proof is evident or presumption great' means something more than *prima facie* evidence, for to read it in this manner would do nothing to advance the constitutional rights of the accused, since a suspect may not be held without a showing of *prima facie* evidence in any case." *Id.* at 222. Moreover, it opined that "the plain language of the evident proof standard in Article I, Section 14 suggests a 'clear and convincing' standard," which "requires evidence that is 'so clear, direct, weighty, and convincing that the trier of fact could come to a clear conviction, without hesitating, concerning the facts at issue.'" *Id.* at 223 (quoting *Com. v. Feucht*, 955 A.2d 377, 380 (Pa. Super. 2008)). The trial court in *O'Shea-Woomer* stated that "[t]his heightened standard of proof provides significant protection to the accused before bail is denied." *Id.*

The trial courts in *Hamborsky* and *O'Shea-Woomer* articulate thoughtful policy arguments why bail requests under Article I, §14 of the constitution should be decided based upon a standard of review other than the *prima facie* test.[2] However, the only appellate authority directly addressing the controlling standard has identified a *prima facie* case of first degree murder as the Commonwealth's appropriate burden of proof. *See Farris, supra; Heiser,*

---

2. In support of its conclusion, the *Hamborsky* court cited two unpublished common pleas court decisions, *Com. v. Ebersole*, No. 106 C 2003 (Bedford Co. 2003), and *Com. v. Long*, No. 4201 C 1999 (Westmoreland Co. 2002), which reportedly rejected the *prima facie* analysis as the appropriate standard of review for bail requests under Article I, §14. *Hamborsky*, 75 Pa. D. & C.4th at 515-516 & n.1.

*supra*. Unlike the courts in *Hamborsky*, and *O'Shea-Woomer*, we do not interpret *Alberti* as requiring clear and convincing evidence of guilt, rather than a *prima facie* case. In describing the governing standard of proof, *Alberti* references "the Commonwealth's evidence which is presented at the bail hearing, together *with all reasonable inferences therefrom*," as being "sufficient in law to sustain a verdict in the first degree." *Alberti*, 412 Pa. at 400-401, 195 A.2d at 98 (emphasis added). A trial court is obligated "to consider all reasonable inferences based on [the Commonwealth's] evidence which could support a guilty verdict" when deciding whether a *prima facie* case has been established. *See Com. v. Winger*, 957 A.2d 325, 328 (Pa. Super. 2008). Thus, the clear directive in *Alberti* that the reviewing court should consider the Commonwealth's evidence "together with all reasonable inferences therefrom" reflects that the *prima facie* standard, as opposed to a more demanding "clear and convincing evidence" requirement, is the appropriate standard of review in determining "when the proof is evident or presumption great."

Under the doctrine of *stare decisis*, common pleas courts may not ignore or disregard decisional precedent of appellate courts in this Commonwealth. *See Com. v. Randolph*, 553 Pa. 224, 230-231, 718 A.2d 1242, 1245 (1998) ("It is a fundamental precept of our judicial system that a lower tribunal may not disregard the standards articulated by a higher court."); *Calabrese v. Colonial Ins. Co. of California*, 45 Pa. D & C.4th 228, 240 (Lacka. Co. 2000) ("A state trial court is bound to follow the ruling of a Pennsylvania appellate court on matters of state law, notwithstanding the fact that a federal district court may have reached a contrary conclusion"). While it is true, as Pal notes in his submissions, that the most direct

pronouncement of the governing standard of proof is set forth in an intermediate appellate decision in *Heiser*, a ruling by the Superior Court remains binding precedent upon Pennsylvania trial courts until it has been overturned by the Pennsylvania Supreme Court. *Marks v. Nationwide Insurance Company*, 762 A.2d 1098, 1101 (Pa. Super. 2000), *app. denied*, 567 Pa. 751, 788 A.2d 381 (2001); *Erie Insurance Exchange v. Soroka*, 2011 WL 2516797, at \*9 (Lacka. Co. 2011), *aff'd*, 47 A.3d 1237 (Pa. Super. 2012). Therefore, pursuant to *Farris* and *Heiser*, the evidentiary record submitted by the Commonwealth will be analyzed to determined whether it establishes a *prima facie* case of first-degree murder against Pal.

A *prima facie* case consists of evidence which, when read in the light most favorable to the Commonwealth, sufficiently establishes both the commission of a crime and that the accused is probably the perpetrator of that crime. *Com. v. Henricks*, 927 A.2d 289, 291 (Pa. Super. 2007); *Com. v. Blakey*, 2008 WL 5380436, at \* 5 (Lacka. Co. 2008), *aff'd*, 4 A.3d 206 (Pa. Super. 2010). The *prima facie* standard does not require the Commonwealth to prove the elements of the crime beyond a reasonable doubt. *Com. v. Ludwig*, 583 Pa. 6, 22, 874 A.2d 623, 632 (2005); *Com. v. Barnes*, 14 A.3d 128, 130 (Pa. Super. 2011). Rather, a *prima facie* case in support of an accused's guilt consists of evidence that, if accepted as true, would justify submission of the case to a jury. *Com. v. Huggins*, 575 Pa. 395, 402, 836 A.2d 862, 866 (2003), *cert, denied*, 541 U.S. 1012 (2004); *Com. v. Cordoba*, 902 A.2d 1280, 1285 (Pa. Super. 2006). In determining the presence or absence of a *prima facie* case, the prosecution must be afforded the benefit of all inferences reasonably drawn from the evidence which would support a guilty verdict. *Com. v. Landis*, 48 A.3d 432, 444 (Pa. Super. 2012); *Blakely*,

*supra.*

## (D) ACCOMPLICE LIABILITY FOR FIRST DEGREE MURDER

The Commonwealth has charged Pal with, *inter alia*, murder of the first degree as an accomplice pursuant to 18 Pa.C.S.A. §306(b)(3), and criminal conspiracy to commit murder of the first degree under 18 Pa.C.S.A. §903(a). (*See* Criminal Information, Counts I, III). "The elements of first-degree murder are as follows: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill." *Com. v. Padilla*, 2013 WL 5848693, at *2 (Pa.2013). A defendant may be convicted as an accomplice to first-degree murder "so long as the facts adequately support the conclusion that he or she aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intention to promote or facilitate the offense." *Com. v. Markman*, 591 Pa. 249, 269, 916 A.2d 586, 597 (2007). The Commonwealth must prove that the defendant himself possessed the specific intent to kill in order to sustain a conviction of first-degree murder as an accomplice. *Com. v. Bennett*, 57 A.3d 1185, 1199-1200 (Pa. 2012); *Com. v. Daniels*, 600 Pa. 1, 33-38, 963 A.2d 409, 429-432 (2009). "The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence." *Com. v. Jackson*, 955 A.2d 441, 444 (Pa. Super. 2008) (quoting *Com. v. Shoff*, 911 A.2d 147, 160 (Pa. Super. 2006)), *app. denied*, 600 Pa. 760, 967 A.2d 958 (2009). "Clearly, evidence of acts to conceal a crime, such as disposing of a victim's body, are relevant to prove the accused's intent or state of mind." *Com. v. Dollman*, 518 Pa. 86, 91, 541 A.2d 319, 322 (1988).

Malice is also an element of first degree murder, and required proof of "wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty." *Com. v. Garland*, 63 A.3d 339, 345 (Pa. Super. 2013). Malice may be inferred after considering the totality of the circumstances. *Com. v. Truong*, 36 A.3d 592, 598 (Pa. Super. 2012), *app. denied*, 57 A.3d 70 (Pa. 2012). "Actions of the accused that occur before, during *and* after are admissible as evidence to show malice." *Com. v. Gonzalez*, 858 A.2d 1219, 1223 (Pa. Super. 2004) (emphasis in original), *app. denied*, 582 Pa. 695, 871 A.2d 189 (2005). "Further, actions that attempt to conceal a crime or destroy evidence are also admissible to prove malice." *Id.*

A person cannot be an accomplice simply based on evidence that [s]he was present at the crime scene, and "[t]here must be some additional evidence that the person intended to aid in the commission of the underlying crime, and then aided or attempted to aid." *Com. v. Rega*, 593 Pa. 659, 690, 933 A.2d 997, 1015 (2007), *cert. denied*, 552 U.S. 1316 (2008). However, the amount of aid "need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime." *Markman*, 591 Pa. at 269-270; *Com. v. Toritto*, 67 A.3d 29, 35 (Pa. Super. 2013). "The least degree of assistance in committing the offense is adequate to sustain the finding of responsibility as an accomplice." *Com. v. Adams*, 39 A.3d 310, 324 (Pa. Super. 2012) (quoting *Com. v. Gladden*, 445 Pa. Super. 434, 450, 665 A.2d 1201, 1209 (1995)).

The direct and circumstantial evidence establishes a *prima facie* case of accomplice liability on the part of Pal. Pal was well aware of the acrimonious relationship between Dominick and Bonacci resulting from their

mutual interest in Keri Tucker. Two months before Bonacci's murder, Dominick had informed Pal in a text message that if Bonacci "ever gets cocky around me, I will just snuff him." In June 2013, Pal had even attempted to broker a fight between Dominick and Bonacci at Step Falls. Dominick and Pal "were best friends" and their "La Familia" tattoos were designed to convey that "if something happened" to either of them, it would be treated as though it had happened to both "of them like a family."

By virtue of that close bond, it is reasonable to infer that Dominick had advised Pal of Bonacci's text message to Ms. Tucker declaring his abiding affection for her on July 18, 2013. A few hours before the murder, Pal informed Sam Senuk at Pal's party that "[s]omebody was messing" with Bonacci. Shortly thereafter, Pal reportedly orchestrated the transportation arrangement which enabled Dominick, Bonacci and Pal to be alone in Bonacci's vehicle. Of those three individuals, only Pal owned a .38 caliber handgun, and the projectile removed from Bonacci's head was consistent with the use of a .38 caliber weapon. In addition, the .38 caliber casing discovered near the crime scene matched the .38 caliber casing seized from Pal's garage. Finally, less than thirty minutes after Pal, Dominick and Bonacci departed in Bonacci's Jeep, Pal contacted Maribeth Castaldi who picked them up at a removed location within 800 yards of where Bonacci's body and vehicle were discovered. When viewed in the light most favorable to the Commonwealth, the evidence indicates that Pal provided the .38 caliber handgun to Dominick and coordinated his opportunity to shoot Bonacci in his Jeep at an isolated location. As such, the totality of these circumstances establishes a *prima facie* case of accomplice liability for first-degree murder.

An accused's conduct following a murder, including

destruction or fabrication of incriminating evidence, is admissible to establish consciousness of guilt of first-degree murder. *See Com. v. Wholaver*, 588 Pa. 218, 226, 903 A.2d 1178, 1183 (2006), *cert. denied*, 549 U.S. 1171 (2007). Moreover, false and contradictory statements by an accused to the police "are indicatory of guilt" of first-degree murder. *Com. v. Carbone*, 524 Pa. 551, 562, 574 A.2d 584, 589 (1990); *Com. v. Donnelly*, 439 Pa. Super. 70, 75, 653 A.2d 35, 37 (1995), *app. denied*, 541 Pa. 633, 663 A.2d 686 (1995). Additionally, evidence that the defendant has attempted to suborn false testimony from a prospective witness is admissible as substantive evidence of consciousness of guilt of first-degree murder. *Com. v. Young*, 561 Pa. 34, 61, 748 A.2d 166, 180 (1999).

Pal made a series of false and contradictory statements to the police. Furthermore, he encouraged Maribeth Castaldi to provide false information to the police regarding Pal's telephone calls and Ms. Castaldi's transportation of Pal and Dominick on the morning of the murder. According to the police, Pal and Dominick also burned their blood-stained clothing at Pal's residence. Whether in isolation or in combination, these post-murder actions by Pal reflect consciousness of guilt of first-degree murder.

Examining the evidence in the light most favorable to the Commonwealth while affording it the benefit of all reasonable inferences to be drawn from that evidence, the direct and circumstantial proof justifies submission of Count I of the criminal information to the jury. The Commonwealth has established a *prima facie* case of accomplice liability for murder of the first degree. Consequently, Pal is not entitled to bail under Article I, §14 of the Pennsylvania Constitution and Section 5701 of the Judicial Code, 42 Pa.C.S.A. §5701.

## (E) CONSPIRATORIAL LIABILITY

Although Pal's motion for bail may be denied solely based upon the Commonwealth's presentation of a *prima facie* case of accomplice liability, the Commonwealth has also demonstrated a *prima facie* case of criminal conspiracy to commit murder of the first degree. "To establish conspiracy to commit murder, the Commonwealth must show that the defendant, with the specific intent to kill, agreed with one or more persons to commit murder, or agreed to attempt to commit murder, or solicited someone to commit such crime or agreed to aid in the commission, attempt, or solicitation of such crime, and committed an overt act towards the commission of the murder." *Com. v. Stokes*, 38 A.3d 846, 855 (Pa. Super. 2011). "Given the surreptitious nature of conspiracy, the existence of a formal agreement is often proven circumstantially, such as by 'the relations, conduct or circumstances of the parties or overt acts on the part of co-conspirators.'" *Com. v. Jacobs*, 614 Pa. 664, 39 A.3d 977, 985 (2012) (quoting *Com. v. Johnson*, 604 Pa. 176, 185, 985 A.2d 915, 920 (2009), *cert. denied*, 131 S.Ct. 250 (U.S. 2010)). In the case of a conspiracy to commit homicide, "each member of the conspiracy can be convicted of first-degree murder regardless of who inflicted the fatal wound." *Com. v. Collins*, 70 A.3d 1245, 1251 (Pa. Super. 2013) (quoting *Johnson, supra*).

The direct and circumstantial evidence discussed in Section II(D) above likewise establishes a *prima facie* case that Pal intended to aid in the commission of Bonacci's murder, entered into an agreement with Dominick to engage in that crime, and committed overt acts in furtherance of that crime. As with accomplice liability, the specific intent to kill necessary to sustain a conviction for criminal conspiracy to commit first-degree murder may be

established through circumstantial evidence. *See Com. v. Montalvo*, 598 Pa. 263, 274-275, 956 A.2d 926, 932-933 (2008), *cert. denied*, 556 U.S. 1186 (2009). The same pre-murder and post-murder conduct by Pal which supports his accomplice liability is also sufficient to establish a *prima facie* case of conspiratorial culpability. Accordingly, the Commonwealth has demonstrated a *prima facie* case of criminal conspiracy to commit first-degree murder, and Pal's Motion for Bail will also be denied on that independent basis. An appropriate follows.

## ORDER

And now, this 27th day of November, 2013, upon consideration of defendant's "Motion for Bail," the Commonwealth's response thereto and the memoranda of law submitted by counsel, and based upon the evidence presented by the Commonwealth at the bail hearing on November 25, 2013, which established a *prima facie* case of murder of the first-degree as an accomplice, 18 Pa.C.S.A. §§306(b)(3) and 2502(a), and criminal conspiracy to commit murder of the first degree, 18 Pa.C.S.A. §§903(a) and 2502(a), it is hereby ordered and decreed that the "Motion for Bail" filed by defendant, Neil Pal, is denied.